Andrew W. Stavros (8615)
**STAVROS LAW P.C.**
8915 South 700 East, Suite 202
Sandy, Utah 84070
Tel: (801) 758-7604
Fax: (801) 893-3573
andy@stavroslaw.com

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CHRISTINE DAIMARU,<br><br>　　　Plaintiff,<br><br>vs.<br><br>WAYFAIR, LLC, a Delaware limited liability company, and WAYFAIR OF DELAWARE, INC., a Delaware corporation,<br><br>　　　Defendants. | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00660-JNP-CMR<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

Pursuant to rules 7 and 56 of the Federal Rules of Civil Procedure[1] and rules 7-1 and 56-1 of the District of Utah Civil Rules,[2] Plaintiff Christine Daimaru ("Plaintiff" or "Daimaru"), by and through her undersigned counsel, submits this Opposition to Defendants' Motion for Summary Judgment.

---

[1] Fed. R. Civ. P. 7; Fed. R. Civ. P. 56
[2] DUCivR 7-1; DUCivR 56-1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND RELIEF REQUESTED ........................................................... 1

RESPONSE TO WAYFAIR'S STATEMENT OF MATERIAL FACTS ..................................... 2

STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS................................. 25

        Work History and Performance Reviews ....................................................... 25

        Allegations of Attendance Issues................................................................ 28

        FMLA Application and Retaliation ............................................................ 29

        Termination.......................................................................................... 31

SUMMARY JUDGMENT STANDARD .................................................................... 37

  I.    DAIMARU'S FMLA CLAIMS should PROCEED TO TRIAL....................................... 38

    A.    Plaintiff Can Establish a Prima Facie Case of FMLA Retaliation ............................. 40

      1.  The temporal proximity of Daimaru's termination in relation to her FMLA protected activity establishes causation.................................................................. 41

      2.  The evidence shows that Daimaru's FMLA leave was a negative factor in the decision to terminate her employment.................................................................. 41

    B.    Wayfair's Reason for Terminating Daimaru was Pretextual. ................................... 44

      3.  Wayfair's failure to conduct even a marginal investigation into Daimaru's claimed work avoidance issues that coincided with her FMLA before terminating her shows pretext. ....................................................................................... 47

      4.  Wayfair's reasons for termination are false and incapable of belief. ........................... 48

      5.  Wayfair's failure to provide Daimaru with the opportunity to update her FMLA request following her FMLA leave renewal shows pretext. ....................................... 50

CONCLUSION............................................................................................... 52

## **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)...................................................41

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986) ....................................................................38

*Bausman v. Interstate Brands Corp*., 252 F.3d 1111, 1122 (10th Cir. 2001)..........................................45

*Bird v. W. Valley City,* 832 F.3d 1188, 1199 (10th Cir. 2016) .................................................................37

*Dewitt v. Southwestern Bell Telephone Co.,* 845 F.3d 1299, 1318 (10th Cir. 2017)...........................39, 47

*E.E.O.C. v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1191 (10th Cir. 2000). ........................39, 40

*Garrett v. Hewlett-Packard Co*., 305 F.3d 1210, 1221 (10th Cir. 2002)..................................................41

*Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1310 (10th Cir. 2005) ...............................................48

*Jencks v. Modern Woodmen of Am*., 479 F.3d 1261, 1267 (10th Cir. 2007) ............................................44

*Jurczyk v. CoxCom, LLC*, 191 F. Supp. 3d 1256, 1267 (N.D. Okla. 2016)..............................................44

*Keeler v. Aramark*, 483 F. App'x 421, 423 (10th Cir. 2012) ...................................................................43

*Kendrick v. Penske Transp. Services, Inc.,* 220 F.3d 1220, 1230 (10th Cir. 2000) .................................48

*Luckett v. Bethlehem Steel Corp*., 618 F.2d 1373, 1382 (10th Cir. 1980) ................................................38

*Martin v. Canon Bus. Sols., Inc.,* Civil Action No. 11-cv-02565-WJM-KMT, 2013 U.S. Dist. LEXIS 129008, at *19
    (D. Colo. Sep. 10, 2013) ....................................................................................................................44

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ......................................................................40

*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).................................40

*Metzler*, 464 F.3d at 1171 .......................................................................................................................41

*Minshall v. McGraw Hill Broad. Co.,* 323 F.3d 1273, 1281 (10th Cir. 2003)...........................................45

*Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008) .........................................................44

*Porter v. Staples the Office Superstore, LLC*, 521 F. Supp. 3d 1154, 1161 (D. Utah 2021) ....................41

*Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) ..................................41

*Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 150 (2000) ...........................................38, 50

*Sally Beauty Co. v. Beautyco, Inc*., 304 F.3d 964, 971 (10th Cir. 2002) ..................................................37

*Smothers v. Solvay Chems., Inc.,* 740 F.3d 530, 538 (10th Cir. 2014) .....................................................40

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)......................................................................50

*Talkin v. Deluxe Corp.,* No. 05-2305-CM, 2007 U.S. Dist. LEXIS 36975, at *22 (D. Kan. May 18, 2007) ..............45

*Turnbull v. Topeka State Hosp.,* 255 F.3d 1238, 1241 (10th Cir. 2011).................................................38

*Water Pik, Inc. v. Med-Sys., Inc*., 726 F.3d 1136, 1143-44 (10th Cir. 2013)...........................................37

*Williams v. E*TRADE Fin.,* No. 2:17-cv-00887-DN, 2019 U.S. Dist. LEXIS 103391, at *17 (D. Utah June 19, 2019)
    ...........................................................................................................................................................39

*Zamora v. Elite Logistics, Inc*., 478 F.3d 1160, 1166 (10th Cir. 2007) ...................................................44

**Statutes**

29 C.F.R. § 825.220(c) ............................................................................................................................43

29 C.F.R. 825.308(d)...............................................................................................................................43

29 U.S.C. § 2612(a)(1)(D)........................................................................................................................39

29 U.S.C. § 2615(a) .................................................................................................................................39

29 U.S.C. § 2615(a)(2) .............................................................................................................................40

**Other Authorities**

DUCivR 56-1..............................................................................................................................................1

DUCivR 7-1................................................................................................................................................1

**Rules**

Fed. R. Civ. P. 56......................................................................................................................................1

Fed. R. Civ. P. 7 .......................................................................................................................................1

## INTRODUCTION AND RELIEF REQUESTED

Plaintiff Christine Daimaru ("Daimaru") was terminated because she exercised her right to use FMLA. The FMLA entitles an employee to up to 12 weeks of medical leave for, among other things, the employee's own serious health condition, and creates liability for employers for interfering or discriminating/retaliating against employers for requesting or using FMLA leave. Here, the facts show that Wayfair terminated Daimaru for taking time off that was approved (or should have been approved as FMLA). At a minimum, there is a fact issue concerning that issue. Daimaru had requested, was approved for, and used Family and Medical Leave Act (FMLA) intermittent leave for her own serious health condition that required her to take frequent, unanticipated breaks from work, and when her symptoms were severe, to take extended leave from work. Because she utilized FMLA, she was terminated and there is no real dispute that Wayfair considered FMLA leave that she took in terminating her employment.

Shortly before she began her career with Wayfair, Daimaru was diagnosed with severe food allergies. In addition to her severe allergies, she also had a cholecystectomy and a hiatal hernia. Because of her condition and health issues, Daimaru suffers from symptoms that include stool urgency and diarrhea, which require her to take frequent bathroom breaks or time off work. Because of this, Daimaru applied for FMLA leave time, first in August 2018, and then again in March, 2019, after she was told her leave was exhausted (which was false) and asked to provide a new FMLA certification (which she did). Wayfair approved her requests and was fully aware of her medical condition and her needs, including her supervisor. Despite this, it disciplined her and terminated her employment because of absences related to her medical condition, including the unpredictable nature of her time off.

1

Shortly after Daimaru began started using her leave time, she received warnings from her supervisors who accused her of "work avoidance" and "time stealing." Her supervisor harassed her and belittled her for making use of her FMLA time and taking the breaks she was entitled to. Even though Daimaru was able to overcome her medical condition and perform her work duties satisfactorily, Wayfair threatened her and eventually terminated her for using FMLA. Accordingly, Wayfair's motion for summary judgment should be denied because she can show that her leave was a factor in her termination, and that the claimed reasons for her termination were pretextual.

## RESPONSE TO WAYFAIR'S STATEMENT OF MATERIAL FACTS

Daimaru responds to Wayfair's statement of facts ("SOF") below.[3]

**Defendants' SOF No. 1.** *Wayfair maintains strict policies forbidding discrimination, harassment, and retaliation and communicates these policies, as well as a complaint procedure to its employees.* ***Ex. 3****, Relevant Policies, EEO, Harassment, Reporting and Retaliation. Violation of these rules results in corrective action, including immediate discharge. Ex. 3 at p. 1 (WAYFAIR000440).*

**RESPONSE: Disputed.** Daimaru disputes that the policies listed in the handbook produced by Wayfair were applicable to her employment.  Specifically, the employee handbook cited by the Defendants states that it is the April 2019 version.[4] Daimaru was terminated on April 1, 2019, the first day these policies could have become effective. Hence, the referenced policies had no application to any period of conduct at issue in this case, and Wayfair has not produced the policies applicable to her performance. Accordingly, this statement of fact is unsupported by the cited evidence.

**Defendants' SOF No. 2.** *Wayfair's EEO policy states, "[a]ny employee who believes he or she has been submitted to any form of unlawful discrimination or other violation of this policy*

---

[3] Facts that are undisputed are only undisputed for purposes of this Opposition.
[4] *See* Plaintiff's Exhibit 1, Wayfair Employee Guide, Version date: April 2019, produced as WAYFAIR000435-494, at p. 1.

*is encouraged and expected to notify Talent Management immediately."   Ex. 4 at p. 2 (WAYFAIR000441). Daimaru Dep. 36: 14-18.*

**RESPONSE: Disputed.** As noted about, Daimaru disputes that the policies listed in the handbook produced by Wayfair are applicable to her employment.  Specifically, the employee handbook cited by Wayfair is a version dated April 2019.[5] Daimaru was terminated on April 1, 2019.[6]  Hence, the referenced policies had no application to any period of conduct at issue in this case. Accordingly, this fact is unsupported by the cited evidence.

**Defendants' SOF No. 3.** *Wayfair's Retaliation policy, which is contained in the Employee Guide acknowledged by Plaintiff, states, "All employees who experience or witness any conduct they believe to be retaliatory should immediately follow the reporting procedures stated above (Reporting Procedures).  Wayfair's Reporting Procedures Policy states, "[i]f you feel you have experienced or witnessed any conduct that is inconsistent with this policy, you are to immediately notify Talent Management or any member of the Management team."  Plaintiff understood that if she felt she had been unfairly retaliated against by another employee or manager, she could report to Wayfair management.  Daimaru Dep. 40:17-41:2; Exhibit 3*

**RESPONSE: Disputed in part**. Daimaru disputes that the policies listed in the handbook produced by Wayfair are applicable to her employment or acknowledged by Daimaru in the acknowledgment.  Specifically, the employee handbook cited by the Defendants is dated April 2019.[7] Plaintiff was terminated on April 1, 2019. Accordingly, this portion of the statement of fact is unsupported by the cited evidence.

**Defendants' SOF No. 4.** *Wayfair also maintains a policy governing FMLA leaves of absences.  Under Wayfair's FMLA policy, for unforeseeable leaves and qualifying exigency leaves, an employee must provide notice as soon as practicable.  Failure to provide notice may be grounds for delaying or denying leave and may result in other adverse consequences.  Additionally, employee generally must comply with Wayfair's normal call-in procedures. Exhibit 4, FMLA Policy.*

**RESPONSE: Disputed.** Daimaru disputes that the policies listed in the handbook produced by Wayfair were applicable to her employment.  Specifically, the employee handbook

---

[5] *Id*. at p. 1.
[6] See Wayfair Ex. 20, Termination Report (Dkt. No. 25-21).
[7] Plaintiff's Exhibit 1, at p. 1.

cited by Wayfair is dated April 2019.[8] Daimaru was terminated on April 1, 2019, the first day the cited policies could have become effective. Further, the referenced policy also states that for unforeseeable leave requests, an employee must provide notice "as soon as practicable."[9]  The policy further provides that "[i]f an employee is certified to take FMLA on an intermittent or reduced leave schedule basis, the employee must advise Wayfair at the time of the absence if the absence is for the employee's certified family or medical leave reason."[10]

**Defendants' SOF No. 5.** *The Wayfair Code of Conduct defines misconduct as "[a]ctions detrimental to the best interest of Wayfair. Such actions include any action which impairs the public reputation of the organization of individual staff members or any action which impairs successful operation of Wayfair." Exhibit 19, Wayfair Conduct of Conduct.  Violations of the Wayfair Code of Conduct may result in appropriate disciplinary action, up to and including immediate discharge.  Id.*

**RESPONSE: Disputed.** See Response to SOF No. 4, which is incorporated herein. Moreover, while the Code of Conduct provides that any violation may result in "corrective action" discipline can "range from an informal discussion with the employee about the matter to immediate discharge," and, "[a]ction taken by management in an individual case does not establish a precedent in other circumstances."[11] Daimaru, however, was not terminated for violating a Code of Conduct.[12]

**Defendants' SOF No. 6.** *Wayfair's Attendance and Adherence policy outlines the procedures for breaks, time off during the working day, and adherence:*

> *Breaks*
> *All employees are expected to return from their break and meal times punctually. All instances of lateness in relation to break times will be treated in a serious manner.  Excessive lateness will be dealt with under the company's Disciplinary policy, up to and including dismissal.*

---

[8] *Id.* at p. 1.
[9] *Id.* at p. 46.
[10] *Id.* at pp. 47-48.
[11] *Id.* at p. 32.
[12] See Wayfair Ex. 20, Termination Report.

4

> *Time off during the working day*
> *Employees may not leave work prior to their normal/fixed finishing*
> *time without permission from their people manager. In the event of*
> *an employee requiring time away from work during the normal*
> *working period, he/ she must report to his/ her people manager*
> *upon leaving and returning to work.*
>
> *Adherence*
> *Is defined as the total percentage of time you are in compliance*
> *with scheduled activities. This takes into account late to ready,*
> *logging off early, breaks, lunches, coaching sessions, etc. To be in*
> *compliance you must be 98% in adherence daily.*

*Exhibit 17, Final Written Warning.*

**OBJECTION:**  Daimaru objects to this SOF as the cited evidence consists of a Final

Written Warning, and not the underlying policies that are referenced therein. As noted, the

policies produced by Wayfair are not applicable to Daimaru's employment (See SOF Nos. 1-4).

Accordingly, the cited testimony lacks foundation, consists of hearsay, and is an admissible

summary as the underlying policies were not produced by Wayfair that were in effect at the time

of the Final Written Warning (March 12, 2019).

**RESPONSE: Disputed in part.**  Subject to the foregoing objections, Daimaru does not

dispute that she received the Final Written Warning. As noted above, the evidence cited to by

Wayfair is not Wayfair's Attendance and Adherence policy, but a Final Written Warning given

to Daimaru. It does not show that the definitions cited herein are contained in Wayfair's policies,

that Daimaru was aware of these policies, and that they are officially adopted by Wayfair.

**Defendants' SOF No. 7.** *Wayfair's Work Avoidance policy provides that "The actions*
*above \*will\* result in a Final Written Warning for misconduct.  Being on a Final Written*
*Warning will hinder movement and/or progression within the company for 90 days, however,*
*this document will stay in your personnel file indefinitely."  Exhibit 17, Final Written Warning;*
*Exhibit 8, WAYFAIR572-573.*

**OBJECTION:**  Daimaru objects to this SOF as the cited evidence consists of a Final

Written Warning, and not the underlying policies that are referenced. As noted, the policies produced by Wayfair are not applicable to Daimaru's employment (See SOF Nos. 1-4). Accordingly, the cited testimony lacks foundation, consists of hearsay, and is an admissible summary as the underlying policies were not produced by Wayfair that were in effect at the time of the Written Warning (March 12, 2019). Additionally, the "Work Avoidance Behaviors" document states that it was created April 25, 2019 (after Daimaru's termination) and last updated on July 6, 2020.[13] Hence, these policies are not relevant.

**RESPONSE: Disputed in part.**  Subject to the foregoing objections, Daimaru does not dispute that she received the Final Written Warning. See also response to SOF No. 6 above, which is incorporated herein.  Specifically, the employee handbook cited by Wayfair is a version that went into effect in April 2019.[14] It does not include a section on Work Avoidance behaviors[15] and simply states that employees should "report regularly to work at your scheduled starting time and put in a full day's work" and "alert your manager at least 1 hour before your scheduled start time, if you must be absent" and includes a general code of conduct.[16]

**Defendants' SOF No. 8.** *Plaintiff received the Employee Guide, was aware of Wayfair's EEO, anti-discrimination, anti-harassment, anti-retaliation, and FMLA leave policies, and acknowledged receipt of the same during her employment.  Daimaru Dep. 30:17-32:21; Exhibit 5, Acknowledgment of Employee Guide*

**RESPONSE: Disputed in part.** Daimaru does not dispute that she received a copy of the Employee Guide that was in effect as of October 20, 2015, when she started working. However, the Employee Guide referred to by Wayfair and produced with this opposition unmistakably did not apply to Daimaru, as discussed above (See SOFs 1-5). Daimaru testified that that she did not remember having an employee guide, that she did not remember the specific

---

[13] See Wayfair Ex. 8, p. 2.
[14] Plaintiff's Exhibit 1 at p. 1 (Wayfair 435-494).
[15] *Id.*
[16] *Id.* at p. 7, Wayfair Employee Guide.

guide Wayfair refer to in this allegation, and that she does not recall reading the guide, and no work avoidance policies are included in the employee guide.[17]

**Defendants' SOF No. 9.** *Plaintiff never reported to Wayfair any incidents of discrimination or retaliation during her employment at Wayfair.  Daimaru Dep. 37:21-23; Daimaru Dep. 41:3-5.*

**RESPONSE: Undisputed but immaterial.** Although Daimaru testified that she did not report retaliation or discrimination, she was not required to do so. The retaliation policy states employees are "encouraged and expected to notify Talent management immediately," but does *not* state that employees are required to do so.[18] Further, the primary retaliatory act at issue in this claim is her termination, which Daimaru could not have reported "during her employment at Wayfair," as she was no longer employed at that time.[19] Daimaru's Final Written Warning occurred only a few weeks before her termination.

**Defendants' SOF No. 13.** *Wayfair issued Plaintiff her first verbal warning for attendance on January 28, 2016.  Exhibit 13, Attendance Report.*

**OBJECTION:**  The cited testimony lacks foundation (Rule 602) and consists of hearsay (FRE 802) for which no exceptions apply (FRE 803) to the extent that Wayfair attempts to rely on the Attendance Report to prove that Daimaru received the referenced verbal warning and thus such document is inadmissible. The verbal warning has not been produced, or its contents, and no testimony is provided concerning what verbal warning was allegedly given to Daimaru and for what purpose.

**RESPONSE: Disputed in part**. Subject to the foregoing objections, Daimaru testified that she did not recall receiving this verbal warning, and no verbal warning has been produced,

---

[17] *See* Wayfair Ex. 2, Deposition of Christine Daimaru, 30:11-15, 31:7-10, 32:5-7.
[18] Wayfair Ex. 3 at p. 7.
[19] *See* Wayfair Ex. 2, 70:14-15.

and no testimony has been provided concerning the reasons for the verbal warning.[20] The

Attendance Report referenced by Wayfair only notes that said warning was given but does not

contain any relevant information regarding the reasoning for the verbal warning, including

whether or not it was for attendance and whether or not Daimaru acknowledged receiving it or

ever received it.[21] While Daimaru does not dispute that she received and signed the "Attendance

Report," she was not terminated for attendance. Rather, the termination report indicates her

termination was for "work avoidance."[22] See also Response to SOF No. 14, below, which is

incorporated herein. Additionally, as noted below, her attendance points could be and were

reduced (See response to SOF Nos. 14-16 below).

**Defendants' SOF No. 14.** *On April 5, 2017, Wayfair issued Plaintiff a verbal warning after she had received (1) a Record of Discussion for an absence point on March 25, 2017 and (2) a Verbal Warning for a Late-To-Ready ("LTR") on March 13, 2017 and March 18, 2017. LTR means being ready to actively open and receive calls from cues. Conversely, Early-to-Leave ("ETL") means logging off before the end of the shift. Daimaru Dep. 42:19-25; 43:13-45:4; 47:7-19; Exhibit 13, Attendance Report.*

**OBJECTION:** The cited testimony lacks foundation (Rule 602) and consists of hearsay

(FRE 802) for which no exceptions apply (FRE 803) to the extent that Wayfair attempts to rely

on the Attendance Report to prove that Daimaru was absent or late to ready. No documents have

been produced showing the purported dates and times she was absence or the purported dates

and times she was late to ready for which she requested or did not request FMLA. Hence,

statements in the Attendance Report referencing underlying information and offered to prove the

truth of the contents set forth therein are inadmissible.

**RESPONSE: Disputed in part.** Subject to the foregoing objections, Daimaru does not

dispute that she received the Attendance Report on April 5, 2017 that provided an "absence

---

[20] Ex. 2, Daimaru Dep., 45:15-20.
[21] See Wayfair Ex. 13, Attendance Report.
[22] See Wayfair Ex. 20, Termination Report.

point" and "LTR." An absence point is issued for taking sick leave (unplanned PTO).[23] An LTR is issued for starting systems late (phone and time keeping system).[24] Absence points and LTRs may be removed for good attendance under Wayfair's attendance reward program.[25] These occurrences reference events that occurred more than two years before Daimaru's termination date and are irrelevant as they were not a basis for Daimaru's termination. Instead, she was terminated for "work avoidance" and had no attendance issues at the time of her termination.[26] See also response to SOF No. 15, which is incorporated herein.

**Defendants' SOF No. 15.** *Wayfair issued Plaintiff another verbal warning on July 25, 2017 for attendance. Daimaru Dep. 49:23-51-5; Exhibit 14.*

**OBJECTION:** The referenced Attendance Report and deposition testimony do not support the facts allege as the cited evidence lacks foundation, consists of hearsay for which no exception applies and was not signed or dated by anyone, and no testimony is offered by Ms. Scott or Ms. Daimaru supporting that Ms. Daimaru was issued or received the Attendance Report. Accordingly, it is inadmissible.

**RESPONSE: Disputed in part.** Subject to the foregoing objections, although Wayfair's Attendance Report claims that a verbal warning was received, Daimaru testified she did not remember receiving this verbal warning.[27] The Attendance Report does not provide the reasoning or explanation for the record of discussion, is not signed by anyone and there is no evidence that this warning was ever issued to or received by Daimaru.[28] The record also indicates that Daimaru *had her points drop off her attendance score,* reflecting an improvement

---

[23] Ex. 2, Daimaru Dep., 44-2-9.
[24] *Id.* at 44:10-45:8
[25] *Id.* at 46:3-19; see also Wayfair Ex. 1 (referring to the reward program and noting discipline for points and the removal of points).
[26] See Wayfair Ex. 20, Termination Report.
[27] See Wayfair Ex. 2, Daimaru Dep., 49:23-50:25.
[28] *See* Wayfair Ex. 14, Attendance Report.

in attendance, not a decline.[29] In other words, the discipline was *reduced* to a verbal warning from a written warning. See also Response to SOF No. 14 above.

**Defendants' SOF No. 16.** *Wayfair issued Plaintiff a fourth verbal warning on December 7, 2017 after a review on December 6, 2017 showed Plaintiff accrued four points in her attendance bucket and 1.75 points in her ETL/LTR bucket. Daimaru Dep. 51:7-52-24. Exhibit 15. The warning specifically provided that "The next occurrence will result in further documentation, up to and including termination of employment." Exhibit 15 (WAYFAIR001283).*

**OBJECTION:** The referenced Attendance Report and deposition testimony do not support the facts allege as the cited evidence lacks foundation, consists of hearsay for which no exception applies, and the Report is not signed or dated by anyone, and no testimony is offered by Mr. Oday or Ms. Daimaru supporting that Ms. Daimaru was issued or received the Attendance Report. Accordingly, it is inadmissible.

**RESPONSE: Disputed**. Subject to the foregoing objections, the Attendance Report referenced by Wayfair is not signed or dated and states that the date the Attendance Report was issued was October 19, 2015, which is Daimaru's hire date.[30] In the section for hiring date, it reads "12/7/15," which is only two months after she was hired. Therefore, the Report does not provide an accurate timeline for these events. Further, the document states that the next occurrence would result in "up to" termination, not that termination was certainly the next action to be taken.[31] More significantly, the only Attendance Report signed by Daimaru states that "furth Attendance Points equaling 7 points will result in a Verbal Warning, 8 will result in a Written Warning, 9 will result in a Final Written Warning , and 10+ will result in a review for action up to and including termination."[32] As to ETL/LRTs, that warning also stated "the accrual of further ETL/LTR points equaling 2.0 will result in a Written Warning, 2.5 will result in a

---

[29] *Id.*
[30] Wayfair Ex.15; Ex. 2, Daimaru Dep, 52:11-19.
[31] *Id.*
[32] See Wayfair Ex. 13 (highlighting point system and reward system).

Final Written Warning, 3+ will result in a review for action up to and including termination."[33]

Hence, Daimaru was allowed to accrue additional attendance and/or ETL/LTR points without

any risk of termination.[34]

**Defendants' SOF No. 17.** *Wayfair placed Plaintiff on a development plan on May 7, 2018 due to her deficient Net Promoter Scores ("NPS"), which are results from customer surveys ratings. Wayfair's NPS expectation for quarter one 2018 was 35% and 30% for quarter two. Plaintiff's NPS for April was 5.88%, March was 20%, February was 13.33% and her 2018 NPS to date was 16.67%. Daimaru Dep. 53:1-54:17; Exhibit 16, Development Plan.*

**OBJECTION:** Daimaru objects to the testimony cited herein to the extent that Wayfair

attempts to use the development plan to prove the content of the NPS scores that are referenced

in the development plan, as those scores have not been produced, and thus such testimony lacks

foundation, consists of inadmissible hearsay, and also consists of an inadmissible summary (FRE

1006) as the underlying documents have not been produced.

**RESPONSE: Disputed in part.** Daimaru does not dispute that she had team meeting

with O'Day that went over the expectations for NPS and that the plan was emailed to her.

Daimaru, however, disputes that the plan provides support, evidence, methodology, or other

indications of how she received those scores, how many reviews were sent, and how reliable

they are. Daimaru's Winter 2018 review indicates she had "only 6 Ring No Answers for all of

2017," the lowest on the team.[35] And her customers have reacted very favorably with an above

average amount of positive feedback responses in addition to giving her an overall CSAT of 4.9

for 2017."[36] For the time period of July 1, 2018, to December 31, 2018, shortly before her

termination, Daimaru received a rating of "meeting current performance expectations" and

"achieved one of the highest CSAT scores in the department. This reflects her commitment to

---

[33] Wayfair Ex. 13, Attendance Report (Dkt. No. 25-16).
[34] *Id.*
[35] *See* Plaintiff's Exhibit 3, Winter 2018 Performance Review, p. 3 (Wayfair 954).
[36] *Id.* at p. 3.

her customers."[37] She also once again achieved one of the highest CSAT scores in her department.[38] There is no support that the development plan had any bearing on the final written warning or termination issued to Daimaru, and the evidence show she satisfied this plan's requirements.

**Defendants' SOF No. 22.** *If Plaintiff needed to step away from her computer for an extended period of time and wanted to use individual intermittent FMLA leave, she was required to notate the needed time on a ticket to Human Resources and send in her FMLA requests at the end of the workday so Human Resources can coordinate with workforce management to excuse the absence of time and properly document the absence as FMLA. Daimaru Dep. 83:20-84:19; O'Day Dep. 72:9-74:6; 76:4-77:21.*

**RESPONSE: Disputed in part.** Daimaru's FMLA leave approval and Wayfair's FMLA policy contradict this claim.[39] The FMLA policy produced by Wayfair merely states that Daimaru "must advise Wayfair at the time of the absence if the absence is for the employee's certified family or medical leave reason."[40]Daimaru testified that she was aware of the need to notate when she was stepping away for FMLA leave time, however, the process for doing so had changed and adapted as time went on.[41] Daimaru testified that she fully complied with what she was asked to do as far as reporting her FMLA leave time.[42]

**Defendants' SOF No. 23.** *Plaintiff was fully aware that her breaks were to be limited to 15 minutes, she needed to clock-out for any breaks longer than 20 minutes, and if she missed any time punches for FMLA or other reasons, she needed to enter a Work Force Management ("WFR") ticket to correct her timecard.  Daimaru Dep. 68: 22-69: 7; O'Day Dep. 87:2-7.*

**RESPONSE: Disputed in part.** Daimaru testified that she was aware of the need to notate when she was stepping away for FMLA leave time and procedure for what breaks needed to be reported, however, the process for doing so had changed and adapted as time went on.[43] Technical issues that went unresolved also interfered with her ability to effectively and easily

---

[37] *See* Plaintiff's Exhibit 4, Winter 2019 Performance Review, pp. 1-2 (Wayfair 955-956).
[38] *Id*. at p. 2.
[39] *See* Wayfair Ex. 4 (FMLA leave policy) and Wayfair Ex. 12 (FMLA leave approval).
[40] See Wayfair Ex. 4, p. 6.
[41] Wayfair Ex. 2, Daimaru Dep., at 83:22-84:22.
[42] *Id*. at 92:1-17.
[43] *Id.* at 83:22-84:22.

report her use of FMLA time.[44] She also testified that she fully complied with what she was asked to do as far as reporting her FMLA leave time.[45] When she was terminated, she testified that a Wayfair employee had was "battling [her] in regards to what [her] FMLA was approved for."[46] When she was terminated, she asked if the time off gaps were correlated with her FMLA time, and Wayfair did not respond."[47] Daimaru submitted FMLA leave requests as she was asked to do and continued to do so up to the date of her termination, including between February 20, 2019 and her termination on April 1, 2019.[48]

**Defendants' SOF No. 24.** *Similarly, Plaintiff knew that Wayfair required her to be logged into the systems five minutes after clocking in.  Daimaru Dep. 52:17-24.*

**RESPONSE**: **Disputed.** Daimaru did not testify that Wayfair "required" her to be logged into the systems five minutes after clocking in. Her testimony was that she needed to be "in [her] ready status" after clocking in.[49] There is no reference to Wayfair policy and thus this allegation is unsupported factually.

**Defendants' SOF No. 25.** *Plaintiff knew she had to report all uses of FMLA time in a timely manner, and she was responsible for reviewing her time record and certifying the time record for accuracy prior to the end of each pay period.  Daimaru Dep. 69: 8-14, O'Day Dep. 86:19-87:1.*

**RESPONSE: Disputed in part**. See response to SOF Nos. 22-24, which are incorporated herein. Daimaru testified that she was aware of the need to notate when she was stepping away for FMLA leave time and procedure for what breaks needed to be reported, however, the process for doing so had changed and adapted as time went on.[50] She unambiguously testified that she fully complied with what she was asked to do as far as reporting

---

[44] *Id.* at 85:18-87:25.
[45] *Id.* at 92:1-17.
[46] *Id.* at 74:20-22.
[47] *Id.* at 75:10-14.
[48] See Plaintiff's Exhibit 5, Christine Daimaru Declaration, ¶¶ 15-30.
[49] Wayfair Ex. 2, Daimaru Dep., at 52:17-24.
[50] *Id.* at 83:22-84:22.

her FMLA leave time.[51] When she was terminated, she testified that a Wayfair employee had been "battling [her] in regards to what [her] FMLA was approved for."[52] When she was terminated, she asked if the time off gaps were correlated with her FMLA time, and Wayfair did not respond."[53] When she was terminated, she was in compliance with Wayfair policy.[54]

**Defendants' SOF No. 26.** *On March 5, 2019, Wayfair issued Plaintiff a Final Written Warning for work avoidance. Daimaru Dep. 56:21-57:8; Exhibit 15, Final Written Warning.*

**OBJECTION:** Daimaru objects to the testimony cited herein to the extent that Wayfair attempts to use the Final Written Warning to prove the content of the word avoidance numbers set forth in the content of the Warning, and thus such testimony lacks foundation, consists of inadmissible hearsay, and also consists of an inadmissible summary (FRE 1006) as the underlying documents showing the alleged discrepancies have not been produced or made available during discovery.

**RESPONSE**: **Disputed in part**. Subject to the foregoing objections, Daimaru does not dispute that she received the Final Written Warning. However, as shown in the performance reviews, there is an inconsistency between the review scores she received and the Final Written Warning. Daimaru's Winter 2018 review indicates she had "only 6 Ring No Answers for all of 2017, the lowest on the team. And her customers have reacted very favorably with an above average amount of positive feedback responses in addition to giving her an overall CSAT of 4.9 for 2017." For the time period of July 1, 2018, to December 31, 2018, shortly before her termination, she received a rating of "meeting current performance expectations" and "achieved one of the highest CSAT scores in the department. This reflects her commitment to her

---

[51] *Id*. at 92:1-17.
[52] *Id*. at 74:20-22.
[53] *Id*. at 75:10-14.
[54] Plaintiff's Exhibit 2, Deposition of Michael O'Day, at 96:7-11; see also Plaintiff's Exhibit 5, Daimaru Decl., ¶¶ 15-34.

customers."[55] She also once again achieved one of the highest CSAT scores in her department.[56] Her productivity was also rated higher than her cohorts.[57] When she was terminated, Daimaru was in compliance with Wayfair policy.[58]

In addition, the Final Written Warning cites conduct that occurred during the first two weeks of February, 2019 when she indisputably was approved and using FMLA after her first FMLA leave request that was approved August 15, 2018 and that allowed her intermittent leave of up to 96 hours per month.[59] Wayfair's own records show Daimaru used FMLA leave on Feb 1, 4, 6-8 and 11-14 during such period.[60] In issuing the warning to Daimaru, there is no evidence that O'Day took into account FMLA approved leave that Daimaru used before issuing this discipline to her, and there is a fact issue as to whether he used her FMLA approved time to discipline her. The Warning states that *"if you end up taking more than 20 min for your break due to FMLA you will need to not only enter an HR ticket to use FMLA but also enter a WFM ticket so they can clock you out during that time."*[61] The Warning also provides "[a]ccurately report all uses of FMLA in a timely manner."[62] See Response to SOF No 32 and additional SOFs below, which are incorporated herein.

**Defendants' SOF No. 27.** *Specifically, the Final Written Warning stated that during the two-week period between February 1, 2019 and February 14, 2019, Plaintiff had engaged in the following five forms of work avoidance:*
- *6 instances of greater than the allowable five-minute difference between when she clocked in and when she signed into the phone system, totaling 63 minutes of work avoidance;*
- *breaks longer than the allowable 20 minutes without clocking out, totaling 418 minutes of work avoidance;*

---

[55] *See* Plaintiff's Exhibit 4, Winter 2019 Performance Review, pp. 1-2 (Wayfair 955-956).
[56] *Id*. at p. 2.
[57] *Id*.
[58] Plaintiff's Exhibit 2, O'Day Dep. 96:7-11.
[59] Plaintiff's Exhibit 13, Final Written Warning (Wayfair 83-86) .
[60] Plaintiff's Exhibit 6, Time off and Leave Requests (Wayfair 69-70).
[61] Wayfair Ex. 17, p. 3.
[62] *Id*. at p. 4.

- *9 time-gaps of 15 minutes or more, totaling 184 minutes of work avoidance;*
- *3 occasions of logging out of the phone system when she was not scheduled to be logged off, totaling 70 minutes of work avoidance;*
- *2 instances of toggling.*

*Daimaru Dep. 57:14-61:3; Exhibit 17, Final Written Warning.*

**OBJECTION:** Daimaru objects to the testimony cited herein to the extent that Wayfair attempts to use the Final Written Warning to prove the content of the word avoidance numbers set forth in the content of the warning, and thus such testimony lacks foundation (FRE 601), consists of inadmissible hearsay (FRE 803), and also consists of an inadmissible summary (FRE 1006) as the underlying documents showing the alleged discrepancies have not been produced.

**RESPONSE: Disputed in part**. See response to SOF No. 26 above, which is incorporated herein. Additionally, Daimaru disputes that she did not accurately report her FMLA leave time.[63]

**Defendants' SOF No. 28.** *Plaintiff had not entered tickets to Human Resources or to Workforce Management to report any of the work avoidance instances discussed in the Final Written Warning as FMLA. O'Day Dep. 78:11-13; 91:18-93:6.*

**RESPONSE**: **Disputed**. See response to SOF No. 26 above, which is incorporated herein. Daimaru disputes that she did not enter tickets.[64] Daimaru testified that she was aware of the need to notate when she was stepping away for FMLA leave time and the procedure for what breaks needed to be reported, however, the process for doing so had changed and adapted as time went on.[65] Technical issues that went unresolved also interfered with her ability to effectively and easily report her use of FMLA time.[66] Daimaru testified that she fully complied with what she was asked to do as far as reporting her FMLA leave time.[67] When she was terminated, she testified that a Wayfair employee had was "battling [her] in regards to what [her] FMLA was

---

[63] Plaintiff's Ex. 5, Daimaru Decl., ¶¶ 1-35.
[64] *Id.*
[65] Wayfair Ex. 2, Daimaru Dep., at 83:22-84:22.
[66] *Id.* at 85:18-87:25.
[67] *Id.* at 92:1-17; see also Plaintiff's Ex. 5.

approved for."[68] When she was terminated, she asked if the time off gaps were correlated with her FMLA time, and Wayfair did not respond."[69] When she was terminated, she believed she was in compliance with Wayfair policy.[70] And she had reported her FMLA leave time, but that such reported leave time is not reflected in the materials provided by Wayfair.[71]

**Defendants' SOF No. 29.** *O'Day discussed with Plaintiff the many different actions that constitute work-avoidance, including the specific examples listed in the Final Written Warning. Daimaru Dep. 63:15-64:11.*

**RESPONSE**: **Disputed in part**. See response to SOF No. 26 above, which is incorporated herein. Daimaru does not dispute that O'Day described actions that constitute work avoidance. However, Daimaru also testified that she fully complied with what she was asked to do as far as reporting her FMLA leave time.[72] Daimaru testified as follows:

> Q.   After your discussions with Michael, what was your understanding of what -- of what Wayfair expected from you as far as tracking your attendance, given your FMLA status?
>
> A.   So with this, I was instructed by my team lead to just ensure that I am clocking in And clocking out any time I am using my FMLA. So after this happened [Final Written Warning]  I had a very strict process for myself to make sure that I was ensuring that I fully clocked out of all of my systems when I was going to be using my FMLA, and then noting the time that I actually clocked out of my systems, and then making sure at the end of the day I sent in the details.
>
> Q.   And at the end of the day when you sent in the details, did any of your supervisors or managers tell you that that was the incorrect way to track your time?
>
> A.   No.[73]

Daimaru testify that it "seemed more that as I was using my FMLA, the question of if I was working or not was more questioned from actually using my FMLA" and that she believed

---

[68] *Id*. at 74:20-22.
[69] *Id*. at 75:10-14.
[70] Plaintiff's Ex. 2, Deposition of Michael O'Day, 96:7-11.
[71] See Plaintiff's Ex. 5.
[72] *Id*. at 92:1-17.
[73] *Id.* at 91:24-92:17.

that the claimed work avoidance issued were "directly correlated" with the times she used FMLA.[74]

**Defendants' SOF No. 30.** *Plaintiff acknowledged that previously on February 5, 2019 O'Day covered with her procedures related to timecard accuracy, explaining that "if you end up taking more than 20 min for your break due to FMLA you will need to not only enter an HR ticket to use FMLA but also enter a WFM ticket so they can clock you out during that time." Daimaru Dep. 64:12-23; O'Day Dep. 85:10-87:11; Exhibit 17.*

**RESPONSE**: **Disputed in part**. Daimaru unambiguously testified that that she fully complied with what she was asked to do as far as reporting her FMLA leave time.[75] When she was terminated, she testified that a Wayfair employee had was "battling [her] in regards to what [her] FMLA was approved for."[76] When she was terminated, Daimaru asked if the time off gaps were correlated with her FMLA time, and Wayfair did not respond."[77] When she was terminated, Daimaru believed she was in compliance with Wayfair policy.[78] See also responses to SOF Nos. 31-32 below, which are incorporated herein. below.

**Defendants' SOF No. 31.** *Plaintiff further acknowledged that on November 21, 2018, O'Day discussed with her that she must log into and out of Moxie and Cisco at the same time, and that the failure to do so is considered work-avoidance, a terminable offense. Daimaru Dep. 65:1-25, O'Day Dep. 87:16-88:1. Exhibit 17. O'Day also provided her with instructions in the event that she could not log into either system because of a technical issue such as:*

- *ALWAYS call IT if you are unable to login to Moxie or Cisco AND enter an engineering ticket*
- *ALWAYS track the exact start and stop time you are logged out of Moxie or CISCO for tech issues*
- *AND record it in your MPM as a journal entry INCLUDING the ticket number you entered*
- *If you come back from lunch or break and realize you forgot to log out of Moxie it is a best practice to notify [Mr. O'Day] and add a journal entry in your MPM Daimaru Dep. 65:1-25, O'Day Dep. 87:16-88:1. Exhibit 17*

---

[74] *Id.* at 81:11-82:19.
[75] *Id*. at 92:1-17.
[76] *Id*. at 74:20-22.
[77] *Id*. at 75:10-14.
[78] Plaintiff's Exhibit 2, O'Day Dep., 96:7-11.

**RESPONSE**: **Disputed in part**. Daimaru does not dispute that she knew she could be disciplined for work-avoidance and that she discussed the contents of the Final Written Warning with O'Day.  However, see response to SOF No. 29 and 30 above, which are incorporated herein. Further, as noted above, there is no support or documentation showing that the periods of work avoidance cited in the Final Written Warning (or Termination Report) were due to anything other than Daimaru's approved FMLA leave. No time records have been produced supporting the claim that there were "6 stances where there was greater than a 5-minute difference between when she clocked in and when she signed into CISCO, totaling 63 minutes" and that Daimaru did not request time off for such time. No records have been produced showing that Daimaru took "12 breaks longer than 20 minutes without clocking out, totaling 418 minutes," or that she did not request FMLA leave for such breaks, or that the "9 time-gaps of 15 minutes or more, totaling 184 minutes," had anything at all to do with work avoidance instead of her FMLA leave. See Response to SOF No. 32 below. All of these facts are disputed. See Daimaru's additional SOFs below, which are incorporated herein.

**Defendants' SOF No. 32.** *Thereafter, O'Day reviewed Plaintiff's activity logs in March of 2019 and discovered that Plaintiff had continued to engage in workplace avoidance after she had received her Final Written Warning.  Exhibit 18, Email ("While I was doing call listening today I had a difficult time finding any recent calls for Christine. I pulled her activity logs to see if she wasn't making calls or if it was a Calabria recording issue. Turns out it was a recording issue. But I had been wanting to check her logs to see if she continued her work avoidant behavior after I addressed it earlier in the month. Turns out she kept doing the same behaviors we gave her a Final for.").*

**RESPONSE**: **Disputed.** Daimaru does not dispute O'Day claims he reviewed the activity logs, but in his email he acknowledges technical issues with the recordings of her calls, and in his testimony he acknowledged that he did not know whether the work avoidance times he identified were for periods Daimaru requested FMLA leave.[79] Indeed, Wayfair has produced no

---

[79] Plaintiff's Ex. 2, O'Day Dep at 110:3-23.

evidence that O'Day communicated with HR about Daimaru's FMLA leave requests or actually reviewed her leave requests and compared the requests to the claimed work avoidance issues raised in the termination report.

As noted previously, Daimaru took FMLA leave between February 1 and February 14 (the dates referred to by O'Day in the Final Written Warning). Wayfair's own records show that Daimaru requested FMLA leave on Feb 1, 4, 6-8 and 11-14 during such period."[80] Notes referencing Daimaru's FMLA leave requests are logged by Wayfair from August 16, 2018 (when her first leave started) through February 20, 2019.[81] Yet, no notations exist for FMLA leave requests made by Daimaru from February 21, 2019 to the date of her termination.[82] Wayfair's own records, however, show that Daimaru took "unpaid time off" on Feb 21, 25-28, March 4-5, 7, 11, 13-14, 18-21, and 25-26.[83] But the only unpaid time off Daimaru took during this period was for FMLA leave.[84] And there is no dispute that Daimaru continued submitting leave requests during such period and renewed her FMLA leave so that it would apply retroactively and she would continue to be able to take leave.[85]

On March 1, 2021 Wayfair HR notified Daimaru that her previous leave (from August, 2018) had purportedly expired and acknowledged to Daimaru that her "requests in Workday were being denied due to your FMLA on file has expired. I still see requested being entered and denied."[86] Hence, there is no dispute that Daimaru continued to submit leave requests.  Despite Wayfair's claims, Daimaru's FMLA leave had not expired when she received this email. Daimaru's physician's certification said that the probable duration of her condition was a year

---

[80] Plaintiff's Ex. 6, Wayfair Time Off and Leave Request Log (Wayfair 69-70).
[81] *Id.*
[82] *Id.* at Wayfair 69-76.
[83] *Id.* at Wayfair 67-68.
[84]  Plaintiff's Exhibit 5, Christine Daimaru Decl. at ¶¶ 1-35.
[85] *Id.*
[86] Plaintiff's Exhibit 7, Email correspondence between Daimaru and HR, p. 7 (Wayfair 967).

when Daimaru submitted her physician certification for her FMLA leave request in August, 2018, and her physician noted that she would need to miss work when her condition was severe and take frequent bathroom breaks because of her condition.[87] Wayfair approved Daimaru's FMLA leave request, allowing her to use up to 96 hours per month of leave, and did not limit the approval to 6 months.[88] Instead, Wayfair told Daimaru the approval would last for 12 months.[89]

From August 15, 2018 through February 20, 2019 Wayfair's records show that Daimaru had only used approximately 240 hours of her approved intermittent FMLA leave (but she was entitled to use up to 480 hours (12 weeks) under the FMLA, but not more than 96 hours in any month based upon her approved leave).[90] Indeed, she never used more than 52.5 hours in any of those months, instead typically using much less time.[91] Yet, her FMLA leave was not approved to only last 6 months.[92] As such, Daimaru responded to HR and said she believed her prior leave from August lasted a year, but told HR that she would obtain a new certification and requested an extension until March 25, 2019 to be able to provide the new certification.[93]

Following the inquiry to HR by Daimaru, on March 12, 2019 O'Day emailed Wayfair's HR and stated "Christine asked me if this email means HR will back date her FMLA after she meets with her doctor. *I told her my understanding is that if her doctor back dates the document to 2/15 and she gets the updated paperwork in before 3/25 then yes. But if she doesn't get paperwork in until after 3/25 than all the occurrences, she incurred from 2/15 to*

---

[87] Plaintiff's Exhibit 8, Daimaru's Physician's FMLA Leave Certification, p. 2 (Part A) (noting probable duration of condition as 1 year) (Wayfair 1366-1369).
[88] Plaintiff's Exhibit 9, Wayfair's FMLA Approval Notice, dated August 15, 2018 (Wayfair 1370).
[89] Plaintiff Ex. 5, Daimaru Decl., ¶¶ 5-10.
[90] See Plaintiff's Ex. 6, Wayfair's Time Off and Leave Request Log for Daimaru, pp. 2-9.
[91] *Id.*
[92] See Plaintiff's Ex. 9.
[93] *Id.* at pp. 5-7 (Wayfair 965-67); see also Plaintiff's Ex. 5, ¶¶ 8-14.

*3/25 will not be excused*."[94] Daimaru submitted the paperwork from her doctor on March 25, 2019 and her request for FMLA was renewed on March 26, 2019.[95] As noted above, Daimaru testified that she fully complied with what she was asked to do as far as reporting her FMLA leave time.[96] Despite communicating with HR and knowing that Daimaru was renewing the FMLA approval, O'Day testified that he did not have evidence that her breaks were not related to FMLA, but instead claimed "this is typical work-avoidance behavior" and suggested that Daimaru was merely using FMLA to "shield herself."[97] Wayfair has provided no evidence that O'Day made any effort to compare the work avoidance issues O'Day raised in the termination report with Daimaru's FMLA leave requests, or to disregard period she was using FMLA leave in evaluating her performance.[98] The logs provided by Wayfair include no requests for FMLA leave from February 20 forward, but it is undisputed Daimaru made requests after February 20.[99]

See also Daimaru's additional SOFs below, which are incorporated herein.

**Defendants' SOF No. 33.** *Specifically, from March 6, 2019 through March 29, 2019, Plaintiff violated Wayfair policies by continuing to engage in work avoidance through the following:*

- *8 instances of time gaps greater than 15 min totaling 135 minutes, they were centered around the use of not ready time*
- *6 breaks longer than 20 minutes without logging out totaling 91 minutes beyond the scheduled break time*
- *21 long breaks but under the 20-minute threshold for clocking out totaling 197 minutes beyond the scheduled break time*

Exhibit 20, Termination Report.

**OBJECTION:** Daimaru objects to the testimony cited herein to the extent that Wayfair attempts to use the Termination Report to prove the content of the word avoidance numbers set

---

[94] *Id.* at p. 4 (Wayfair 964).
[95] See Plaintiff's Exhibit 13, March 26, 2019 FMLA leave approval (noting Wayfair received Daimaru's documentation on March 25, 2019 (Wayfair 967).
[96] *Id.* at 92:1-17.
[97] *Id.* at 110:3-23.
[98] *Id.*
[99] See Plaintiff's Ex. 5 (Daimaru Declaration) and Ex. 6 (emails with HR discussing denied leave requests).

forth in the content of the Report, and thus such testimony lacks foundation, consists of inadmissible hearsay, and also consists of an inadmissible summary (FRE 1006) as the underlying documents showing the alleged discrepancies have not been produced, only Mr. O'Day's summary of such information.

**RESPONSE: Disputed**. Subject to the foregoing objections, Daimaru refers to her response to SOF No. 32 above, which is incorporated herein. In addition, as noted, this claim is contradicted by Daimaru's performance reviews as set forth in the response to Defendants' SOF No. 27. As noted, Wayfair's own records show that Daimaru took unpaid time off on March 7, 11, 13-14, 18-21, and 25-26, and that she took paid time off on March 6 and 26th, but the Termination Report does not address such time off or whether it was approved FMLA, and instead terminates her because of such leave.[100]  See also Daimaru's additional SOFs which are incorporated herein.

**Defendants' SOF No. 34.** *O'Day determined that "Combined these behaviors total 423 minutes of work avoidance since Christine's Final Written Warning for work avoidance was discussed with her on 3/5."  Exhibit 20, Termination Report (emphasis added).*

**OBJECTION:** Foundation, hearsay, inadmissible summary and best evidence rule. See Objection in Response to SOF No. 33 above, which is incorporated herein.

**RESPONSE: Disputed in part**. Daimaru does not dispute that these statements are in the report. However, see response to SOF No. 32, which is incorporated herein, and Daimaru's SOFs below, which directly dispute this claim.

**Defendants' SOF No. 35.** *O'Day's review of Plaintiff's activity logs showed Plaintiff had not submitted any Human Resources or WFM tickets for approval of any of the work avoidance incidents from March 6, 2019 through March 29, 2019 as FMLA, nor did she make corrections when given the opportunity to validate time records at the end of the pay periods. O'Day Dep.  108:1-109:24. Exhibit 20.*

---

[100] See Wayfair Ex. 20.

**RESPONSE**: **Disputed.**   See response to SOF No. 32, which is incorporated herein. Daimaru testified that she fully complied with what she was asked to do as far as reporting her FMLA leave time.[101] And Wayfair's HR acknowledged that she had been submitting her requests, but denied the requests even though Daimaru's FMLA leave had not expired.[102] O'Day testified that he did not have evidence that Daimaru's claimed work avoidance issues were not related to FMLA, but claimed "this is typical work-avoidance behavior" and suggested that Daimaru was merely using FMLA to "shield herself."[103] See also Daimaru's additional SOFs which are incorporated herein.

**Defendants' SOF No. 36.** *On April 2, 2019, O'Day called Plaintiff via telephone with Talent Management Representative Al Edwards and told Plaintiff she was being terminated for work avoidance behavior.  Daimaru Dep.70:16-71:6; 73:22-74:1. Exhibit 20*

**RESPONSE: Disputed in part**. Daimaru does not dispute she was notified of her termination on April 2, 2019. However, Daimaru testified that she was terminated in retaliation for making use of her FMLA time.[104]  See also response to SOF No. 32, which is incorporated herein. See also Daimaru's additional SOFs which are incorporated herein.

**Defendants' SOF No. 37.** *Daimaru admitted that she had no evidence to support her belief her termination was based on prior FMLA use, rather than her repeated instances of work avoidance:*

> *Q. What evidence do you have that those work-avoidance issues correlate to your FMLA leave?*
> *A. I don't have any physical evidence on my side.*
> *...*
> *Q. Is there any other evidence that you have, other than your belief that the work-avoidance issues were directly related to your request for FMLA leave?*
> *A. I do not have any documents or evidence that I have on my side.*

*Daimaru Depo. 83:16-19; 85:8-12.*

---

[101] Plaintiff's Exhibit 2, O'Day Dep. at 92:1-17.
[102] *See* Plaintiff's Ex. 7.
[103] *Id*. at 110:3-23.
[104] Wayfair Ex. 1, Daimaru Dep., 81:13-14.

**RESPONSE: Disputed.** Wayfair misconstrues Daimaru's testimony concerning what "physical evidence" she had. As noted above in response to SOF No. 29, she testified that the work avoidance times were times she used FMLA. See also response to SOF 32 above, and Daimaru's addition SOFs set forth below.

## STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

### Work History and Performance Reviews

1.      On October 19, 2015, Wayfair hired Daimaru as an "Email – Customer Service Consultant."[105]

2.      Daimaru worked for Wayfair from October, 2015 through April 1, 2019.[106]

3.      Daimaru was an employee of Wayfair's Orem office throughout her employment with Wayfair.[107]

4.      About eight months after she started with Wayfair, Daimaru started performing customer service calls and chat inquiries, in addition to email customer service.[108]

5.      She was then promoted to the position of SSC Case Manager for Wayfair, which included handling and resolving escalated customer support situations as part of a specialized team.[109]

6.      In her 2017 Winter Performance Review, Daimaru received an overall evaluation rating of "meets expectations."[110]

7.      In her 2018 Winter Performance Review, Daimaru received a score of "meets expectations."[111]

---

[105] Plaintiff's Exhibit 10, Wayfair Offer Letter to Daimaru (Wayfair 13-15).
[106] Wayfair Ex. 2, Daimaru Dep., 22:5-11.
[107] *Id.* at 22:22-23:3.
[108] *Id.* at 24:11-25.
[109] *Id.* at 23:18-23; 25:9-12.
[110] Plaintiff's Exhibit 11, 2017 Winter Performance Review (Wayfair 953).

8.      In 2018, Daimaru was promoted to a Case Manager role.[112]

9.      Around the summer of 2018, O'Day became Daimaru's direct supervisor as he had become a work-from-home manager and Daimaru was on his team, and she likewise worked from home.[113]

10.     In her 2019 Winter Performance Review (covering the period of 7/20/18-12/31/18), Daimaru also was "meeting current performance expectations."[114] This review covered the period of time O'Day directly supervised Daimaru.

11.     Notably, as part of the 2019 Review issued by O'Day, O'Day emphasized that Daimaru achieved "productivity of 7.14 updates/hr compared to her cohort's average of 7.02 updates/hr."[115]

12.     She also ranked 89th out of 313 consultants for her CSAT score, or customer satisfaction survey score, which O'Day said "reflect[ed] her commitment to her customers."[116] In fact, er supervisor, Mr. O'Day, stated that "she achieved one of the highest CSAT scores in the department" and noted that "customers often remark on the excellent level of customer service she provides."[117]

13.     None of the foregoing performance reviews issued to Daimaru made mention of any attendance or clock-in/clock-out issues, availability or adherence problems, or work avoidance issues.

---

[111] Plaintiff's Exhibit 3, (Wayfair 954).
[112] Wayfair Ex. 2, Daimaru Dep., 23:18-23; 25:9-12.
[113] Plaintiff's Ex. 2, O'Day Dep. at 10:11-12:21.
[114] Plaintiff's Exhibit 4, p. 1 (Wayfair 955-56).
[115] *Id.*
[116] *Id.*
[117] *Id.*

14.     During his deposition O'Day said attendance cannot factor into performance reviews "especially with someone who has FMLA."[118]

15.     However, he also testified that in his role as manager, one of his responsibilities is to "monitor your employees' attendance" and "make sure they don't go over on attendance."[119]

16.     Prior to filing for FMLA, Daimaru had not received a disciplinary action based on her performance.[120] And O'Day only created an Attendance Report for Daimaru in December, 2018, which was a verbal warning that placed Daimaru well below the metrics used by Wayfair to evaluate employee attendance.[121]

17.     The only issue regarding her performance she ever received was a Development Plan Wayfair O'Day placed her on based on NPS scores in May, 2018, around the time he became her supervisor.[122]

18.     NPS is a "key indicator" that is a "once-every-six-month survey" Wayfair sends to customers to ask "how they feel about Wayfair" based on interactions they had with the employee.[123]

19.     However, based on her 2019 Winter Performance Review, during the period after this development plan, Daimaru achieved one of the highest CSAT (customer satisfaction survey score) scores, indicating her commitment to customers and showing her customers believe she provides an "excellent level of customer service."[124] Also, there is no evidence that Daimaru did

---

[118] Plaintiff's Ex. 2, O'Day Dep., 68:4-9.
[119] *Id*. at 15:8-23.
[120] *See* Defendants' SOF Nos. 13-17 and responses thereto.
[121] See Wayfair Ex. 15.
[122] Wayfair Ex. 16, Development Plan.
[123] Plaintiff's Exhibit 2, O'Day Dep., 17:7-20; 56:8-13.
[124] Plaintiff's Exhibit 4, p. 2 (Wayfair 955-956).

not satisfy the terms of the plan, as any deficiencies in this regard were not noted on the Termination Report created by O'Day.[125]

20.     In fact, her manager testified that "the customers she helped were very happy, the quality of her work was good. That was never an issue."[126]

21.     By all accounts, therefore, by her 2019 Winter Performance Review, Daimaru was provided excellent customer service and achieved high productivity scores.[127]

<u>Allegations of Attendance Issues</u>

22.     An Attendance Report issued by Wayfair references Daimaru receiving a verbal warning for attendance on January 28, 2016 from Megan Scott, a prior supervisor.[128]

23.     Daimaru testified that she did not recall receiving this verbal warning.[129]

24.     The Attendance Report referred to by Wayfair only notes that said warning was given but does not contain any relevant information regarding the reasoning for the verbal warning, including whether or not it was for attendance and whether or not it was issued to Daimaru, and she acknowledged receiving it.[130]

25.     Wayfair alleges it issued Daimaru another verbal warning on July 25, 2017 for attendance, however Daimaru testified she did not remember receiving this verbal warning either.[131]

26.     The Attendance Report does not provide the reasoning or explanation for the alleged verbal warning.[132]

---

[125] Wayfair Ex. 20.
[126] Plaintiff's Ex. 2, O'Day Dep., 55:22-56:3.
[127] Plaintiff's Ex. 4 at p. 2; Plaintiff's Ex. 2, O'Day Dep., 64:1-5.
[128] Wayfair Exhibit 13.
[129] Wayfair Ex. 2, Daimaru Dep., 45:15-20.
[130] Wayfair Ex. 13.
[131] Ex. 2, Daimaru Dep., 49:23-50:25.
[132] Wayfair Ex. 14.

27.     The Attendance Report also indicates that Daimaru had her attendance points drop off, reflecting an *improvement* in attendance.[133]

28.     On December 7, 2017, Daimaru received a verbal warning regarding her attendance.[134]

29.     This was the last warning related to attendance she received prior to applying for FMLA and prior to receiving her Final Written Warning.

<u>FMLA Application and Retaliation</u>

30.     Daimaru first applied for and was approved for FMLA leave in August 2018.[135]

31.     She was approved for intermittent leave up to 96 hours per month.[136]

32.     On March 26, 2019, she renewed her FMLA leave application.[137]

33.     Michael O'Day testified that Wayfair would require that any time she needed to make use of her FMLA time, even for just 10 minutes, she would have to clock out "for a full half hour" because it is not paid time.[138]

34.     O'Day's testimony is inconsistent with Wayfair's FMLA policy.[139]

35.     Wayfair's FMLA policy does not dictate a specific reporting procedure for using FMLA leave.[140]

36.     Daimaru testified that she was aware of the need to notate when she used FMLA leave time and procedure for what breaks needed to be reported, however, she testified the process for doing so had changed and adapted as time went on.[141]

---

[133] *Id.*
[134] Ex. 2, Daimaru Dep., 51:11-52:24.
[135] Plaintiff's Exhibit 9, FMLA Designation Notice 2018 (Wayfair 1370).
[136] *Id.*
[137] Plaintiff's Ex. 13, FMLA Designation Notice 2019.
[138] Ex. 5, O'Day Dep., 74:7-75:18.
[139] Wayfair Ex. 4, FMLA Leave Policy
[140] *Id.*

37.    Technical issues that went unresolved also interfered with Daimaru's ability to effectively and easily report her use of FMLA time.[142]

38.    Daimaru testified that the process she and Michael O'Day, her supervisor, came up with was to inform him if she was going to be stepping away from her computer to use FMLA time.[143]

39.    However, due to the frequency of her use of FMLA leave, she was told to notate when she was stepping away and then send in her requests at the end of the day if she used any FMLA time during that day.[144]

40.    Daimaru testified that she fully clocked out of all of her systems and made sure to send in her time at the end of each day.[145]

41.    No manager ever informed her that the method she was using to report her FMLA time was incorrect or improper.[146]

42.    On March 5, 2019, Wayfair issued Daimaru a Final Written Warning for work avoidance.[147]

43.    The Final Warning covered the final two weeks of her FMLA leave time.[148]

44.    The Final Written Warning cites conduct that occurred during the first two weeks of February, 2019 when Daimaru was approved for and using FMLA after her first FMLA leave

---

[141] Ex. 2, Daimaru Dep., at 83:22-84:22
[142] *Id.* at 85:18-87:25.
[143] *Id*. at 83:22-25.
[144] *Id*. at 83:25-84:5.
[145] *Id*. at 92:1-17.
[146] *Id*.
[147] Wayfair Ex. 17, Final Written Warning (Wayfair 83-86).
[148] *Id*.

request had been approved on August 15, 2018 and that allowed her intermittent leave of up to 96 hours per month.[149]

45.     Wayfair's own records show Daimaru used FMLA leave on Feb 1, 4, 6-8 and 11-14 during such period.[150] This leaves overlaps the days during which O'Day claimed he found work avoidance.[151]

46.     In issuing the warning to Daimaru, there is no evidence that O'Day took into account FMLA approved leave that Daimaru used before issuing this discipline to her.[152]

47.     However, O'Day acknowledges he knew Daimaru had been using FMLA leave during said period. The Warning states that "if you end up taking more than 20 min for your break due to FMLA you will need to not only enter an HR ticket to use FMLA but also enter a WFM ticket so they can clock you out during that time."[153] The Warning also provides "[a]ccurately report all uses of FMLA in a timely manner."[154]

48.     O'Day testified that he did not have evidence that her breaks were not related to FMLA, but that he believed it was not due to her medical condition because "this is typical work-avoidance behavior" and suggested that Daimaru was merely using FMLA to "shield herself."[155]

<u>Termination</u>

49.     Wayfair alleged that Daimaru's FMLA had expired on February 15, 2019, the day after the period O'Day suddenly audited Daimaru for work avoidance issues and issued here a Final Written Warning.

---

[149] See Plaintiff's Ex. 9; Wayfair Ex. 17.
[150] Plaintiff's Exhibit 6, Time off and Leave Requests (Wayfair 69-70).
[151] See Wayfair Ex. 17, Final Written Warning.
[152] *Id;* compare with Plaintiff's Ex. 6.
[153] Wayfair Ex. 17, p. 3.
[154] *Id*. at p. 4.
[155] Plaintiff's Ex. 2, O'Day Dep*.,* 110:3-23.

50.     Although Wayfair gave her an extension to submit her paperwork to recertify her FMLA leave. Daimaru was not approved again until March 26, 2019.[156]

51.     On April 1, 2019, only six days after being approved for her FMLA leave time, and seven days after submitting the new certification from her physician, Daimaru was terminated.[157]

52.     The Termination Report referencing Daimaru's termination specifically noted issues with her attendance from March 6, 2019, to March 29, 2019, which means for the majority of that time, Daimaru's FMLA still had not been approved or backdated.[158]

53.     As noted above, Daimaru took FMLA leave between February 1 and February 14 (the dates referred to by O'Day in the Final Written Warning). Wayfair's own records show that Daimaru requested FMLA leave on Feb 1, 4, 6-8 and 11-14 during such period."[159]

54.     Notes referencing Daimaru's FMLA leave requests are logged by Wayfair from August 16, 2018 (when her first leave started) through February 20, 2019.[160] Yet, no notations exist for FMLA leave requests made by Daimaru from February 21, 2019 to the date of her termination, April 1, 2019.[161]

55.     These same records, however, show that Daimaru took "unpaid time off" on Feb 21, 25-28, March 4-5, 7, 11, 13-14, 18-21, and 25-26.[162] But the only unpaid time off Daimaru took during this period was for FMLA leave.[163]

56.     Daimaru continued submitting leave requests during such period and renewed her

---

[156] *Id.* at 105:20-106:1; see also Plaintiff's Ex. 13 (2019 FMLA Approval).
[157] Wayfair Ex. 20, Termination Report.
[158] *Id.*
[159] Plaintiff's Ex. 6, Wayfair Time Off and Leave Requests Log (Wayfair 69-70)
[160] *Id.*
[161] *Id.* at Wayfair 69-76.
[162] *Id.* at Wayfair 67-68.
[163]  Plaintiff's Exhibit 5, Christine Daimaru Declaration at ¶¶ 8-35.

FMLA leave so that it would apply retroactively, and she would continue to be able to take leave.[164]

57.     On March 1, 2021 HR notified Daimaru that her previous leave (from August, 2018) had purportedly expired and acknowledged to Daimaru that her "***requests in Workday were being denied due to your FMLA on file has expired. I still see requested being entered and denied***."[165] (emphasis added).

54.     But Daimaru's FMLA leave had not expired when she received the email. Daimaru's physician said that the probable duration of her condition was a year when Daimaru submitted her physician certification for her FMLA leave request in August, 2018, and her physician noted that she would need to miss work when her condition was severe and take frequent bathroom breaks because of her condition.[166] Wayfair approved Daimaru's FMLA leave request, allowing her to use up to 96 hours per month of leave over a 12 month period.[167]

55.     From August 15, 2018 through February 20, 2019 Wayfair's records show that Daimaru had only used approximately 240 hours of her FMLA leave (but she was entitled to use up to 480 hours (12 weeks) under the FMLA, but not more than 96 hours in any month based upon her approved leave).[168]  From August, 2018 through February, 2019, Daimaru never used more than 52.5 hours of FMLA leave in any month, instead typically using much less time.[169]

56.     Daimaru's FMLA leave was not approved to only last 6 months.[170]

---

[164] *Id.*; Plaintiff's Exhibit 5, Daimaru Decl. at ¶¶ 1-35.
[165] Plaintiff's Exhibit 7, Email correspondence between Daimaru and HR, p. 7 (Wayfair 967).
[166] Plaintiff's Exhibit 8, Daimaru's Physician's FMLA Leave Certification, p. 2 (Part A) (noting probable duration of condition as 1 year) (Wayfair 1366-1369).
[167] Plaintiff's Exhibit 9, Wayfair's FMLA Approval Notice, dated August 15, 2018; see also Plaintiff's Ex. 5 (Wayfair 1370).
[168] See Plaintiff's Ex. 6, Wayfair's Time Off and Leave Requests for Daimaru, pp.2-9.
[169] *Id.*
[170] See Plaintiff's Ex. 9.

57.     Daimaru told HR and said she believed her prior leave from August lasted a year, but, when requested to provide a new certification, she told HR that she would obtain a new certification and requested an extension until March 25, 2019 to be able to provide the new certification.[171]

58.     On March 12, 2019 O'Day emailed Wayfair's HR and stated "Christine asked me if this email means HR will back date her FMLA after she meets with her doctor. I told her my understanding is that if her doctor back dates the document to 2/15 and she gets the updated paperwork in before 3/25 then yes. But if she doesn't get paperwork in until after 3/25 than all the occurrences, she incurred from 2/15 to 3/25 will not be excused."[172]

59.     Daimaru submitted the paperwork from her doctor on March 25, 2019 and her request for FMLA was renewed on March 26, 2019.[173]

60.     Daimaru testified that she fully complied with what she was asked to do as far as reporting her FMLA leave time.[174] Despite communicating with HR and knowing that Daimaru was renewing her FMLA, O'Day testified that he did not have evidence that her breaks were not related to FMLA, but instead claimed "this is typical work-avoidance behavior" and suggested that Daimaru was merely using FMLA to "shield herself."[175]

61.     Wayfair has provided no evidence that O'Day made any effort to compare the work avoidance issues with Daimaru's FMLA leave requests, or to take disregard period she was using FMLA leave in evaluating her performance.[176]

62.     Daimaru was told that once her certification was received Wayfair would "make a

---

[171] *Id*. at pp. 5-7 (Wayfair 965-67).
[172] *Id.* at p. 4 (Wayfair 964).
[173] See Plaintiff's Exhibit 13, March 26, 2019 FMLA leave approval (noting Wayfair received Daimaru's documentation on March 25, 2019 (Wayfair 967).
[174] *Id*. at 92:1-17.
[175] *Id*. at 110:3-23.
[176] *Id.*

determination on the continuing designation of your requested absence(s) as FMLA leave."[177]

63.     Only a few days after she was approved for FMLA leave, Michael O'Day checked Daimaru's logs to see "if she continued her work avoidant behavior."[178]

64.     He stated that "[t]urns out she kept doing the same behaviors we gave her a Final for."[179]

65.     However, given the short amount of time after approval, O'Day did not know whether she had gone back to enter her FMLA time.[180]

66.     When asked whether he verified if Daimaru entered her FMLA time, O'Day was unable to give an answer.[181]

67.     O'Day testified that he did not have evidence that Daimaru's breaks were not related to FMLA, but that he believed it was not due to her medical condition because "this is typical work-avoidance behavior" and suggested that Plaintiff was merely using FMLA to "shield herself."[182]

68.     He testified that "in [his] mind, these behaviors have nothing to do with her FMLA."[183]

69.     Even though her FMLA was renewed only a few days earlier, O'Day testified he believed Daimaru "was given every opportunity to confirm that she had entered all of her FMLA accurately before any disciplinary action was taken."[184]

---

[177] *Id*. at p. 6.
[178] *Id*. at p. 1.
[179] *Id*.
[180] Plaintiff's Ex. 2, O'Day Dep., 100:15-101:15.
[181] *Id*. at 108:18-110:23.
[182] *Id*. at 110:3-23.
[183] *Id*. at 110:22-23.
[184] *Id*. at 117:5-7.

70.     When she was terminated, Daimaru testified that a Wayfair employee had was "battling [her] in regards to what [her] FMLA was approved for."[185] Specifically, she testified that during the termination issue when she raised the issue of her FMLA leaves she was told by the other participant in the meeting the following:

> A.     I really just remember the other person who was present, Al, he ended up battling me in regards (sic) to what my FMLA was approved for, which didn't have to do with any of the actual termination. That's the only rest of it that I really remember.
>
> Q.     So your response to being terminated for work-avoidance issues was that you asked Michael whether this had anything to do with your request for FMLA, right?
>
> A.     Yes.
>
> Q.     You did not dispute any of the work-avoidance issues that he brought up, right?
>
> A.     I was asking if those were the instances he saw.
>
> Q.     If what were the instances he saw?
>
> A.     So if the instances where he saw I wasn't -- I didn't have any record of working, if they were in correlation to FMLA requests I had sent in and used.  That's the only thing I can remember from that conversation.
>
> Q.     Okay.  So do you remember what FMLA requests you had sent in?
>
> A.     No, I don't remember.
>
> Q.     Do you have any record of those?
>
> A.     I don't.

71.     When she was terminated, Daimaru asked if the time off gaps were correlated with her FMLA time, and Wayfair did not respond."[186]

72.     As discussed at length above, Daimaru's performance was not made an issue and all her performance reviews prior showed she performed to expectations or better.[187]

---

[185] Wayfair Ex. 2, Daimaru Dep., 74:20-75:19.
[186] *Id*. at 75:10-14.

73.     Daimaru testified that she was terminated in retaliation for making use of her FMLA time.[188]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[189] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[190] In determining whether there is a genuine dispute of material fact, the court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[191]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[192] "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial."[193] However, if the nonmoving party "bears the burden of persuasion of a claim at trial," such as in this case, "the nonmoving party [remains] entitled to all reasonable inferences from the record."[194]

"[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for

---

[187] *Id*. at 114:13-22.
[188] *Id*. at 81:13-14.
[189] *Bird v. W. Valley City,* 832 F.3d 1188, 1199 (10th Cir. 2016) (internal citation omitted).
[190] *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998).
[191] *Id*.
[192] *Id*. at 670-71.
[193] *Sally Beauty Co. v. Beautyco, Inc*., 304 F.3d 964, 971 (10th Cir. 2002).
[194] *Water Pik, Inc. v. Med-Sys., Inc*., 726 F.3d 1136, 1143-44 (10th Cir. 2013).

trial."[195] Even where a movant's facts are undisputed, if two reasonable fact-finders could reach different conclusions or "ultimate inferences" from the undisputed facts, summary judgment is not warranted.[196] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[197]

## ARGUMENT

Wayfair's motion for summary judgment relies entirely on self-serving statements set forth in the Final Written Warning issued to Daimaru on March 5, 2019 and the Termination Report issued to her on April 1, 2019. However, both the Final Written Warning and Termination Report punishes Daimaru for using FMLA leave she was indisputably approved to use and requested to use. Wayfair claims that in March of 2019 Daimaru's supervisor Michael O'Day, suddenly "discovered that during a two-week period during the prior month, Daimaru had engaged "work avoidance." This two-week period was the last two weeks before Wayfair claimed Daimaru's FMLA ended, and immediately before it required her to request a recertification of her leave. Other than Mr. O'Day's self-serving statements – which may be disregarded by a jury – Wayfair has offered no documents to support such a claim. And, significantly, Daimaru disputes such claims and affirmatively alleges that any work avoidance was due to exercising her right to FMLA leave and using FMLA leave. Hence, a fact issue exists necessitating a trial. Accordingly, for these and other reasons, Wayfair's motion should be denied.

## I.   DAIMARU'S FMLA CLAIMS SHOULD PROCEED TO TRIAL.

---

[195] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).
[196] *See Luckett v. Bethlehem Steel Corp*., 618 F.2d 1373, 1382 (10th Cir. 1980) (citations omitted).
[197] *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 150 (2000); *Turnbull v. Topeka State Hosp.,* 255 F.3d 1238, 1241 (10th Cir. 2011) (citation omitted).

The FMLA entitles a qualified employee to take up to twelve weeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."[198] It is unlawful for any employer to interfere with or retaliate against an employee's exercise or attempted exercise of these rights.[199] Courts construe Section 2615(a)(1) as interference claims and Section 2615(a)(2) as retaliation claims.

To prevail on an FMLA interference claim, an employee must show (1) she was entitled to FMLA leave, (2) her employer took an adverse action that interfered with her right to take FMLA leave, and (3) the employer's action was related to the exercise or attempted exercise of her FMLA rights.[200] "If the employee can demonstrate that the first two elements of interference are satisfied, the employer then bears the burden of demonstrating that the adverse decision was not related to the exercise or attempted exercise of [the employee's] FMLA rights."[201] Here, Wayfair cannot show that it did not interfere with Daimaru's exercise of her FMLA rights, as noted below. Hence, at a minimum, her claim of interference should go to trial.[202]

An FMLA retaliation claim is subject to a slightly different analysis than the claim of interference.[203] For retaliation, the employee bears the burden of establishing a prima facie case of retaliation, by proving that (1) she engaged in a protected activity; (2) the employer took an

---

[198] 29 U.S.C. § 2612(a)(1)(D).

[199] 29 U.S.C. § 2615(a).

[200] *Williams v. E*TRADE Fin.,* No. 2:17-cv-00887-DN, 2019 U.S. Dist. LEXIS 103391, at *17 (D. Utah June 19, 2019).

[201] *Id.*

[202] *Id.*

[203] *Dewitt v. Southwestern Bell Telephone Co.,* 845 F.3d 1299, 1318 (10th Cir. 2017).

action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action."[204]

The FMLA makes it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."[205] Courts construe this provision of the FMLA as creating a retaliation theory of recovery.[206] Wayfair correctly points out that Tenth Circuit analyzes FMLA retaliation claims under the three-step *McDonell Douglas* framework articulated by the Supreme Court of the United States.[207] The *McDonnell-Douglas* framework involves three steps: (1) the plaintiff must establish a prima facie case of retaliation; (2) the defendant employer must offer a legitimate non-retaliatory or discriminatory reason for the adverse employment action; and (3) the  must show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual.[208]

### A.  Plaintiff Can Establish a Prima Facie Case of FMLA Retaliation

In its motion, Wayfair only challenges one element of Daimaru's prima facie case of FMLA retaliation - causation.[209] The burden placed upon Daimaru at the *prima facie* stage is a light burden. Courts have stated her burden at the *prima facie* stage requires only a "small amount of proof necessary to create an inference" of retaliation[210]  by "a preponderance of the evidence."[211] Simply put, her burden is "not onerous."[212] In this case, Daimaru can easily satisfy

---

[204] *Smothers v. Solvay Chems., Inc.,* 740 F.3d 530, 538 (10th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).
[205] 29 U.S.C. § 2615(a)(2).
[206] *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).
[207] *Smothers,* 740 F.3d 530, 538 (10th Cir. 2014).
[208] *Id*.
[209] See Motion for Summary Judgment, p. 15.
[210] *Id.* at 539.
[211] *E.E.O.C. v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1191 (10th Cir. 2000).

her prima facie burden of causation.

       1.   *The temporal proximity of Daimaru's termination in relation to her FMLA protected activity establishes causation.*

In establishing a causal connection, the "critical inquiry" at this prima facie stage is "whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination."[213] The Tenth Circuit has "repeatedly recognized temporal proximity between protected conduct and termination as relevant evidence of a causal connection sufficient to justify an inference of retaliatory motive."[214] Here, the temporal proximity between Daimaru's second request for leave and her termination satisfies her prima facie burden to show causation.

First, it is undisputed that Daimaru was approved to use FMLA leave first on August 15, 2018 and then again on March 26, 2019.[215] Second, it is undisputed that the decision to terminate her employment was made on or before April 1, 2019, when her termination report was created by O'Day.[216] The gap between her most recent FMLA request and her termination is, at most, a week. The Tenth Circuit has held that a "retaliatory motive may be inferred when an adverse action closely follows protected activity."[217] Hence, temporal proximity alone establishes causation for purposes of Daimaru's case.

       2.   *The evidence shows that Daimaru's FMLA leave was a negative factor in*

---

[212] *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1197 (*quoting Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253(1981)); *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 n. 4 (10th Cir. 2013) (prima facie burden is "slight"); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004) (prima facie burden is "relatively lax").

[213] *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (quotations omitted).

[214] *Metzler*, 464 F.3d at 1171 (internal quotations omitted).

[215] See Ex. 2, Daimaru Dep., Exs. 15 (FMLA Leave Approval) & 16 (FMLA Leave Approval).

[216] See Ex. 2, Daimaru Dep., Exs, 12 (Termination Report).

[217] *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994)); *Porter v. Staples the Office Superstore, LLC*, 521 F. Supp. 3d 1154, 1161 (D. Utah 2021) (denying motion to dismiss FMLA retaliation claim based upon 8-week temporal proximity).

*the decision to terminate her employment.*

The evidence also shows that Daimaru's leave was a negative factor in her termination. Daimaru's second FMLA leave request was approved on March 26, 2019 for up to three times per week (8 hours each day), or 1 day per episode, after she resubmitted her physician certification following Wayfair's March 1, 2019 request to recertify her leave. Daimaru's second FMLA leave approval did not place restrictions on when and how she could take her leave, and there is substantial evidence that her FMLA was a negative factor in her termination.

As noted above, O'Day audited Daimaru during the last two weeks of her leave (before Wayfair was scheduled to request a recertification) and claimed that Daimaru had been engaging in work avoidance behavior. Yet, there is no evidence that he took into account Daimaru's leave requests in issuing her discipline, and Wayfair's own records shows that Daimaru took FMLA leave during this period.

On February 26, 2019 Wayfair's HR reached out to Daimaru and told her that while it had been receiving FMLA leave requests from Daimaru, her prior FMLA leave had expired on February 15, 2019 and the requests for FMLA leave after that date were being denied.[218] This was false, as her leave had been approved for up to twelve months, and as of February 26th, Wayfair had not asked her to recertify the need for her leave. Wayfair did not request a recertification at that time, but instead emailed Daimaru again on March 1, 2019, requesting for the first time that she complete a new certification for her leave in order to continue using FMLA leave.[219] While Wayfair was entitled to request recertification of Daimaru's FMLA leave every

---

[218] Plaintiff's Ex. 7, p. 9.
[219] *Id.* at p. 8 ("We are requesting that you submit to the HR department, within 15 calendar days, an updated certification of your Health Care Provider form, the FMLA medical certification form, WH-380 (attached). If needed, we will delay the approval of any additional FMLA time off requests until this process is complete.")

six months,[220] it was not entitled to deny her prior requests as her initial FMLA leave had not

expired and no request for recertification had been made before such date. Not only was this

claim false, Wayfair told her that she need to resubmit her certification within 15 days, which

was also against the law.[221] Hence, any FMLA leave absences prior to March 1, 2019 –

including those that were included in the Final Written Warning – that were counted against her

were unlawful as she was approved and had not exhausted her leave and was entitled to continue

to use it unless her certification was not approved.[222]  The law is clear: an employer cannot use

employee's use of FMLA leave as a negative factor in employment actions.[223] Yet, that's exactly

what Wayfair did.

When requested, Daimaru provided another certification from her health care provider to

Wayfair by March 25th, as requested, and her second request for leave was approved on March

26, 2019. The decision to terminate her was made six calendar days later (which included an

intervening weekend) on April 1, 2019, and indisputably was based upon work avoidance

directly tied to her breaks and leave that were FMLA qualifying.

Wayfair failed to consider any FMLA leave requests made by Daimaru from February

20, 2019 up to and including her last day of work, March 29, 2019, and failed to retroactively

apply such leave in considering the reasons for her termination.[224] In other words, the record

shows that Wayfair terminated Daimaru by considering absences that were approved for

---

[220] See 29 C.F.R. 825.308(d) which allows additional time for certain reasons.
[221] Plaintiff's Ex. 7, p. 6.
[222] See Plaintiff's Ex. 6, pp. 1-9 (showing only slightly more than 240 hours of FMLA leave from August, 2018 through February 20, 2019).
[223] 29 C.F.R. § 825.220(c); see also *Keeler v. Aramark*, 483 F. App'x 421, 423 (10th Cir. 2012)
[224] Plaintiff's Ex. 6, pp. 1-3.

coverage under the FMLA but that it did not credit in her favor, even though Daimaru continued to submit requests for leave and was told such requests would be reviewed.[225]

### B. Wayfair's Reason for Terminating Daimaru was Pretextual.

Wayfair claims it terminated Daimaru because of work avoidance. The evidence supporting this claim is scant and unreliable and largely inadmissible, as noted in response to Wayfair's SOFs above. Nonetheless, Wayfair's motion must still be denied because Daimaru can show that Wayfair's explanation for her termination is pretextual for a variety of reasons.

"A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence."[226] Pretext may be established by revealing "weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[227] In determining whether an employee has shown pretext, the Court must consider the plaintiff's evidence in its totality.[228]

> *1. Daimaru's evidence establishing causation for her prima facie case may also be used to establish pretext.*

As noted above, temporal proximity, and the consideration of Daimaru's FMLA leave in the work avoidance issues raised to discipline her and then terminate her establishes causation.

---

[225] See *Jurczyk v. CoxCom, LLC*, 191 F. Supp. 3d 1256, 1267 (N.D. Okla. 2016) (denying summary judgment to employer because a jury could conclude that the termination-triggering absences were in fact FMLA-covered or would have been covered by a subsequent approval).
[226] *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007).
[227] *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007).
[228] *Martin v. Canon Bus. Sols., Inc.,* Civil Action No. 11-cv-02565-WJM-KMT, 2013 U.S. Dist. LEXIS 129008, at *19 (D. Colo. Sep. 10, 2013) (citing *Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008)).

This same evidence may be used to show pretext.[229]   The Tenth Circuit has said that temporal proximity plus some other piece of circumstantial evidence is sufficient to establish pretext necessary to avoid summary judgment.[230] Accordingly, the evidence set forth above is sufficient to deny Wayfair's motion for summary judgment and to proceed to trial.

### 2. Evidence of Wayfair's animus toward Daimaru's FMLA leave supports a finding of pretext.

Evidence of Wayfair's animus toward Daimaru's FMLA leave is also relevant. For example, the evidence shows that O'Day audited Daimaru's FMLA during the last two weeks of the first six months of her FMLA, that Wayfair intended to request a recertification of her leave thereafter, and that Wayfair provided false information to Daimaru concerning her leave and the recertification process. In addition, O'Day's testimony that Daimaru's breaks and time off were typical work avoidance behaviors and that she was simply using FMLA to "shield herself" is evidence of animus sufficient to establish pretext.[231]

On March 25, 2019, after being asked to do so, Daimaru renewed her FMLA leave application and it was approved by Wayfair the following day, March 26, 2019.[232] Only five days later, O'Day suddenly reviewed Daimaru's attendance (over the weekend) and claimed he found it "[t]urns out she kept doing the same behaviors we gave her a Final for."[233] But, O'Day

---

[229] *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1122 (10th Cir. 2001) (holding that a plaintiff may rely on the same evidence to prove her *prima facie* case and show pretext); see also *Talkin v. Deluxe Corp.,* No. 05-2305-CM, 2007 U.S. Dist. LEXIS 36975, at *22 (D. Kan. May 18, 2007) (denying summary judgment because of a genuine dispute as to whether plaintiff was on an unpaid leave of absence after his FMLA leave expired).
[230] *Id.*
[231] *Minshall v. McGraw Hill Broad. Co.,* 323 F.3d 1273, 1281 (10th Cir. 2003) ("discriminatory statements . . . can show . . . animus [when the plaintiff] demonstrat[es] a nexus between [the] statements and the defendant's decision to [reduce the hours of] the plaintiff.").
[232] Plaintiff's Ex. 13, FMLA Designation Notice 2019 (Wayfair 351).
[233] *Id.*

admittedly he had no knowledge of whether Daimaru had gone back to enter her FMLA time.[234]
When asked whether he verified if Daimaru entered her FMLA time, O'Day was unable to give
an answer.[235] O'Day also testified that he did not have evidence that Daimaru's breaks or
unaccounted for time were not related to FMLA leave, but claimed he believed it was not due to
her medical condition because "this is typical work-avoidance behavior" and suggested that
Daimaru was merely using FMLA to "shield herself."[236] He testified that "in [his] mind, these
behaviors have nothing to do with her FMLA."[237] There is no evidence, however, that O'Day
reviewed or analyzed Daimaru's FMLA leave requests before making the decision to terminate
her, and there's no evidence he consulted with Wayfair's HR or Daimaru to determine which
work avoidance issues he identified were for FMLA leave. Yet, the record shows that on March
12, 2019 he reached out to Wayfair's HR to obtain confirmation concerning the treatment of her
FMLA leave requests:

> "Christine asked me if this email means HR will back date her FMLA after
> she meets with her doctor. I told her my understanding is that if her doctor
> back dates the document to 2/15 and she gets the updated paperwork in before
> 3/25 then yes. But if she doesn't get paperwork in until after 3/25 than all the
> occurrences she incurred from 2/15 to 3/25 will not be excused. Do I understand
> this correct? Thanks in advance for your help."[238]

Despite knowing that she had submitted requests and was still submitting them, he
claimed instead she had not reported the FMLA leave requests, even though such claim is
contradicted by his email with HR and HR's email to Daimaru indicating that she had been
submitting requests all along, but they had been denied.

---

[234] Plaintiff's Ex. 2, O'Day Dep., 100:15-101:15.
[235] Id. at 108:18-110:23.
[236] Id. at 110:3-23.
[237] Id. at 110:22-23.
[238] Plaintiff's Ex. 7, p. 4.

3. *Wayfair's failure to conduct even a marginal investigation into Daimaru's claimed work avoidance issues that coincided with her FMLA before terminating her shows pretext.*

Wayfair's failure to even conduct a marginal investigation into the work avoidance issues that O'Day purportedly identified, after Daimaru asked whether those issues were related to her leave, and she was told that her FMLA leave requests would be reviewed after she submitted her updated certification, shows pretext.[239] Even worse, Wayfair told Daimaru to continue to submit the FMLA requests she had been submitting, to file a new certification and once the new FMLA request was approved, Wayfair would retroactively review her requests.[240] It did no such thing. Instead, when it became clear that Daimaru had submitted an updated certification, O'Day reviewed her activity logs (over the weekend) and found a reason to terminate her employment, without considering Daimaru's leave requests. This type of action is retaliation.

In light of such facts, Wayfair could not have honestly believed that the breaks and work avoidance issues it ultimately claims it terminated Daimaru for were legitimate. An employer cannot turn a blind eye and ignore competent evidence before it and then magically claim it acted in good faith. To believe Wayfair's story, you would need to believe that Daimaru simply did not submit leave requests, even though she made the effort to revisit her doctor, have her doctor complete a certification, submit the certification to Wayfair for approval and then simply not use FMLA leave after going through this extensive process. Moreover, as noted above, Wayfair's records purport to show that Daimaru never requested any leave from February 20, 2019 forward, a claim that is directly contradicted by its own communications with Daimaru

---

[239] *Dewitt*, 845 F.3d at 1314 ("failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext.")
[240] Plaintiff's Ex. 7.

concerning her leave.[241] Such a claim is preposterous, and a jury is entitled to disbelieve Wayfair's claim and find it unworthy of credence.

4.   *Wayfair's reasons for termination are false and incapable of belief.*

There is also significant evidence showing Wayfair's claims of work avoidance issues by Daimaru outside of her FMLA approved leave are false. Evidence showing the employer provided a false reason is sufficient to show pretext.[242] Here, the evidence shows that Wayfair's articulated reasons were demonstrably false. Wayfair, including Daimaru's supervisor, O'Day, knew her medical condition required irregular breaks, and that her leave time varied in length and frequency and, most importantly, predictability. Not one request for FMLA leave from February 20, 2019 through April 1, 2019 made by Daimaru was ever input into Wayfair's system, even though Wayfair and O'Day acknowledged that she had been submitting requests as late as March and even though Daimaru asked Wayfair's HR that "If I need to use time with FMLA during these next few weeks will the time be able to be covered/excused as FMLA, once I get my new paperwork in? Just want to make sure that I understand what I can expect for the next few weeks."[243]

To make matters worse, O'Day gave Daimaru conflicting information on the procedure for clocking out for taking her breaks. He testified that Wayfair would require that any time she needed to make use of her FMLA time, even for just 10 minutes, she would have to clock out "for a full half hour" because it is not paid time, which is not reflected in the policy, and which

---

[241] See Plaintiff's Ex. 7; compare with Plaintiff's Ex. 6.
[242] *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1310 (10th Cir. 2005); *Kendrick v. Penske Transp. Services, Inc.,* 220 F.3d 1220, 1230 (10th Cir. 2000).
[243] Plaintiff's Ex. 6.

expressly violated the terms of her leave.[244] An Daimaru  testified that she fully complied with what she was asked to do as far as reporting her FMLA leave time.[245]

Throughout 2018 Daimaru received no formal disciplinary actions regarding work avoidance. Her performance reviews showed she was meeting expectations as an employee, and the issues regarding her attendance were never addressed, even though her supervisor testified that in his role as manager, one of his responsibilities is to "monitor your employees' attendance" and "make sure they don't go over on attendance."[246] He also testified that adherence to your work schedule was "a metric that was very important" and a key performance indicator.[247] Yet, issues of her attendance are not reported in any of her performance reviews, nor are work avoidance issues.

Prior to her termination, O'Day and others at Wayfair were well aware of Daimaru's FMLA needs, that her FMLA had expired, and that she was in the process of renewing her FMLA application.[248] On March 25, 2019, she renewed her FMLA leave application and it was approved by Wayfair the following day.[249] Only five days later, O'Day suddenly reviewed her attendance (over the weekend) and claimed he found it "[t]urns out she kept doing the same behaviors we gave her a Final for."[250] O'Day admittedly did not know whether she had gone back to enter her FMLA time.[251] When asked whether he verified if Daimaru entered her FMLA time, O'Day was unable to give an answer.[252] O'Day also testified that he did not have evidence that her breaks were not related to FMLA, but that he believed it was not due to her medical

---

[244] Plaintiff's Ex. 2, O'Day Dep., 74:7-75:18.
[245] Wayfair Ex. 2, Daimaru Dep., 92:1-17.
[246] Plaintiff's Ex. 2, O'Day Dep., 15:8-23.
[247] *Id*. at 17:7-20:9.
[248] *Id*.
[249] Plaintiff's Ex. 13, FMLA Designation Notice 2019.
[250] *Id*.
[251] Plaintiff's Ex. 2, O'Day Dep., 100:15-101:15.
[252] *Id*. at 108:18-110:23.

condition because "this is typical work-avoidance behavior" and suggested that Daimaru was merely using FMLA to "shield herself."[253] He testified that "in [his] mind, these behaviors have nothing to do with her FMLA."[254] When she was terminated, Daimaru also testified that a Wayfair employee had was "battling [her] in regards to what [her] FMLA was approved for."[255]

Between the timing of her FMLA renewal, the vitriol, distrust, and skepticism being broadcast by her managers, and penalizing Daimaru for using approved FMLA leave, a trier of fact could find that there is a causal connection between Daimaru's FMLA leave and her termination. These facts are more than enough to show that the proffered reasons offered by Wayfair are false. These facts are also more than enough for a jury to find that Wayfair's proffered reasons for terminating Daimaru are unworthy of belief.[256]

5. *Wayfair's failure to provide Daimaru with the opportunity to update her FMLA request following her FMLA leave renewal shows pretext.*

Daimaru's management failed to provide her an adequate opportunity to update her FMLA leave requests when her FMLA application was renewed. As noted above, Wayfair claimed Daimaru's FMLA application expired on February 15, 2019, and in an email discussing her FMLA status, Daimaru was informed that her FMLA time off requests were being denied because her FMLA expired.[257] She was told that once the forms were received, "we will make a

---

[253] *Id*. at 110:3-23.

[254] *Id*. at 110:22-23.

[255] *Id*. at 74:20-22.

[256] In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 147, 120 S. Ct. 2097, 2108 (2000) (citations omitted). The inference may be particularly strong if the factfinder's disbelief of the defendant's reasons "is accompanied by a suspicion of *mendacity*." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (emphasis supplied).

[257] Plaintiff's Exhibit 7.

determination on the continuing designation of your requested absence(s) as FMLA leave."[258] The Termination Report specifically noted issues with her attendance from March 6, 2019 to March 29, 2019, a period during which Daimaru's FMLA still had not been approved or backdated.[259] She was not fully approved for FMLA time again until March 26, 2019.[260] On a late Sunday evening, March 31, 2019, only 5 days after her FMLA renewal was submitted, O'Day checked Daimaru's logs to see "if she continued her work avoidant behavior."[261] He stated that "[t]urns out she kept doing the same behaviors we gave her a Final for."[262] However, given the short amount of time after approval, O'Day did not know whether she had gone back to enter her FMLA time.[263] When asked whether he verified if she entered her FMLA time, O'Day was unable to give an answer.[264]  At a minimum, the failure of Wayfair to give Daimaru enough time to update her FMLA entries that had already been denied previously, as stated in the email cited above, shows pretext. She was told after her application was approved, Wayfair would "make a determination" on her designation. O'Day's testimony indisputably shows that there was no effort made to ensure that any attendance issues were not related to her need for FMLA leave time, and Wayfair has no evidence that anyone considered Daimaru's FMLA leave requests during this period. Accordingly, this testimony and evidence creates a genuine dispute of material fact as to whether Wayfair's offered reason of her attendance issues were just pretext for terminating her because she was making use of her FMLA time.

Based on the foregoing, Daimaru has presented evidence to create a genuine dispute of material fact as to whether Wayfair's offered reasons for her termination are pretextual.

---

[258] *Id*. at p. 6.
[259] Wayfair Ex. 20.
[260] Plaintiff's Ex. 13.
[261] Ex. 13 at p. 1.
[262] *Id*.
[263] Plaintiff's Ex. 2, O'Day Dep., 100:15-101:15.
[264] *Id*. at 108:18-110:23.

## **CONCLUSION**

For the reasons stated herein, Daimaru requests that this Court deny Defendants' Motion for Summary Judgment.

Dated this 4th day of April, 2022.

/s/     **Andrew W. Stavros**
Andrew W. Stavros
STAVROS LAW P.C.
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 4th day of April, 2022, I delivered a true and correct

copy of the foregoing **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** by the Federal Court's electronic

filing notification system to the following individuals:

Rick D. Roskelley
Ethan D. Thomas
LITTLER MENDELSON, P.C.
222 Main Street, 5th Floor
Salt Lake City, Utah 84101
rroskelley@littler.com
edthomas@littler.com
*Attorneys for Defendants*

  /s/ Jessika Clayton