IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CHRISTINE DAIMARU, <br><br> Plaintiff, <br><br> v. <br><br> WAYFAIR, LLC and WAYFAIR OF DELAWARE, INC., <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:21-cv-00660-JNP-CMR <br><br> District Judge Jill N. Parrish <br><br> Magistrate Judge Cecilia M. Romero |

Before the court is a motion for summary judgment brought by Defendants Wayfair, LLC and Wayfair of Delaware, Inc. ("Wayfair"). ECF No. 25. The court held oral argument on the motion on September 2, 2022. At the conclusion of the hearing, the court took the motion under advisement. After considering the written submissions and the arguments presented at the hearing, the court GRANTS Wayfair's motion for summary judgment.

**BACKGROUND**

Wayfair is an online retail business that operates warehouses throughout the United States. On Wayfair's website, customers can order products that the company then delivers from its warehouses. ECF No. 25 at 3. Wayfair hires Customer Service Consultants to assist customers with post-order issues such as returns, replacements, refunds, delivery status, and back-order inquiries. *Id.* at 4.

Customer Service Consultants at Wayfair use two software programs each day—Moxie and Cisco. *Id.* First, consultants clock in to work using Moxie. Then, consultants sign in to

1

Wayfair's phone software, Cisco. Wayfair permits employees five minutes between when they clock in on Moxie and when they must enter a "ready" state in the Cisco system, meaning that the employee is actively open to accepting calls, emails, and chats. Failure to enter the "ready" state within five minutes of clocking in constitutes work avoidance. *Id*. Wayfair also provides employees with two fifteen-minute breaks each shift. If employees take a break lasting more than twenty minutes, Wayfair policy instructs that they must clock out. *Id*.

Wayfair hired Christine Daimaru as an Email Customer Service Consultant on October 19, 2015. ECF No. 38-2 at 2. Although Wayfair technically assigned Daimaru to the company's Orem facility, Daimaru worked from home as part of a fully remote team. ECF No. 25 at 7. About eight months after joining Wayfair, Daimaru added customer service calls and chat inquiries to her responsibilities. ECF No. 35 at 25. Daimaru subsequently was promoted to Case Manager in 2018 and began handling escalated customer inquiries. *Id*. at 26. Michael O'Day became Daimaru's supervisor on the Case Manager team around August 2018. ECF No. 25 at 7.

Daimaru received generally positive reviews for her work. Her supervisors rated her performance as "[m]eets expectations" for July 2016 to December 2016, July 2017 to December 2017, and July 2018 to December 2018. ECF No. 37-1, 37-2, 38-3. However, O'Day noticed from tracking Daimaru's metrics that she regularly needed extended bathroom breaks during working hours. Instead of treating this as a work avoidance issue, O'Day counseled Daimaru to reach out to HR about getting periodic FMLA leave. ECF No. 49-1 at 71:20-72:2. Daimaru did so, and on August 15, 2018, Wayfair approved Daimaru for up to 96 hours of FMLA leave per month, to be used in thirty-minute increments. ECF No. 35 at 29.

When a Wayfair employee receives intermittent FMLA, Wayfair policy states that, "the employee must advise Wayfair at the time of the absence if the absence is for the employee's

certified family or medical leave reason." ECF No. 25-5 at 3-4. O'Day testified that he advised Daimaru that if she needed to step away from her computer for an extended period of time and wanted to use individual intermittent FMLA leave, she was required to notate the needed time on a ticket to Human Resources and send in her FMLA requests at the end of the workday so that HR could coordinate with workforce management to excuse the absence and properly document it as FMLA. ECF No. 49-1 at 72:9-75:6, 76:4-77:21. O'Day also testified that if Daimaru missed any time punches for FMLA or other reasons, she needed to enter a workforce management ("WFM") ticket to correct her timecard. ECF No. 49-1 at 87:2-7. These steps would ensure that Daimaru was not paid for time that she did not work, and that her time off would be marked as FMLA leave so that she did not receive negative performance evaluations for failing to adhere to her schedule.[1]

After Daimaru began using FMLA leave, O'Day noticed that she was disappearing for periods during the day without clocking out. ECF No. 49-1 at 76:8-21. When O'Day confronted Daimaru about these periods, she told him that when she took breaks she often believed that she would not need to clock out because she expected her time away from work would be short. Sometimes these breaks lasted much longer than Daimaru anticipated due to her medical issues. *Id*. at 76:22-77:3. O'Day counseled Daimaru that if this happened, Daimaru needed to (1) enter a ticket for the workforce management team asking them to retroactively clock her out and back in for the missed time, and (2) send an email to HR alerting them that the time out was due to FMLA leave. *Id*. at 77:14-21. Wayfair expected that employees enter their FMLA time in Workday, their time management software, within 24 hours of returning to work. *Id*. at 79:9-20.

---

[1] Daimaru argues in her brief that Wayfair did not have a clear policy dictating a specific reporting procedure for using FMLA leave. ECF No. 35 at 12. However, she mischaracterizes her own deposition testimony, which states that she understood Wayfair's procedures after her Final Written Warning.  ECF No. 25-3 at 57:11-69:20.

O'Day held several discussions with his entire team about conduct relevant to this case. First, on January 8, 2019, O'Day "[c]overed work avoidance and clarified that a first instance would result in a Final Written Warning" ECF No. 25-18 at 3. Second, on February 5, 2019, O'Day "[c]overed the section of Wayfair's employee guide that pertains to time card accuracy." *Id*. Prior to issuing biweekly paychecks, Wayfair policy requires employees to review their time punches for accuracy. O'Day reminded his team that "[i]t is the employee's responsibility to review his or her time record to certify the accuracy of all time recorded, prior to the end of the pay period." *Id*.

On February 5, 2019, O'Day also conducted a formal coaching with Daimaru where he reminded her that "if you end up taking more than 20 min for your break due to FMLA you will need to not only enter an HR ticket to use FMLA but also enter a WFM ticket so they can clock you out during that time." *Id*. at 3.

On February 26, 2019, HR reached out to Daimaru to notify her that her FMLA had expired as of February 15, 2019. ECF No. 25-11. Accordingly, Daimaru's leave requests in Workday following this purported expiration had been denied. *Id*. HR noted that it had placed this information in the comments of the denial each time it rejected a request. *Id*. On March 1, 2019, HR again emailed Daimaru notifying her that her FMLA requests in Workday were being denied because her FMLA had lapsed. ECF No. 37-5. HR informed her that she would need another certification from her doctor and that her requested FMLA leave for February and March could be backdated with her doctor's approval. *Id*. Daimaru submitted the recertification on March 25, 2019, and on March 26, 2019, Wayfair renewed Daimaru's FMLA leave. ECF No. 25-13, 38-5. The company permitted her to take leave three times per week, for up to eight hours or one day per episode. *Id*.

On March 12, 2019, O'Day issued Daimaru a Final Written Warning. ECF No. 25-18. The warning cited a series of instances, all occurring between February 1 and February 14, where Daimaru engaged in work avoidance behavior, such as taking breaks without clocking out or going more than fifteen minutes without any work-related activity. *Id*. The warning required Daimaru to "[a]bstain from any work avoidant behavior," "[c]lock out for any breaks longer than 20 minutes," "[e]nter a WFM ticket Workday/Payroll to correct any missed time punches," "[a]ccurately report all uses of FMLA in a timely manner," and "[r]eview her time record to certify the accuracy of all time recorded, prior to the end of each pay period." *Id*. at 4.

On March 31, 2019, five days after Daimaru received a renewal of her FMLA leave, O'Day notified his supervisor that she had continued to engage in the same work avoidant behaviors for which he had issued the Final Written Warning, including numerous 15-minute gaps without work-related activity and taking breaks longer than 20 minutes without clocking out. ECF No. 25-19. The next day, April 1, 2019, Wayfair terminated Daimaru. ECF No. 25-21. The Termination Report cited a combined total of 423 minutes of work avoidance between March 6, 2019, and March 29, 2019 as reasoning for the decision. *Id*. As in Plaintiff's Final Written Warning, this work avoidant conduct included "breaks longer than 20 min[s] without clocking out," "time gaps greater than 15 min[s]," and numerous "long breaks but under the 20 minute threshold for clocking out." *Id*.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there

5

is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## ANALYSIS

The Tenth Circuit "has recognized two theories of recovery under 29 U.S.C. § 2615(a): an entitlement or interference theory arising from § 2615(a)(1), and a retaliation or discrimination theory arising from § 2615(a)(2)." *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006). Daimaru brings a claim under both theories. The court begins by addressing the evidentiary objections raised by each party before turning to Daimaru's FMLA claims.

## I.   EVIDENTIARY OBJECTIONS

### A.   *Plaintiff's Objections*

Daimaru advances two categories of evidentiary objections to Wayfair's statement of facts. First, she objects several times to the fact that Wayfair cites a policy with a "version date" of April 2019. But Wayfair's citation of an updated policy manual does not create a genuine dispute of material fact. Whatever the exact language or date of the policy manual, it is indisputable that Wayfair did not tolerate work avoidant behavior. This much is clear from O'Day's statement that "every six months [he], share[d] the entire work avoidance policy" with his employees. ECF No. 49-1 at 87:12-13. Additionally, Daimaru's deposition indicates that she recalled learning about Wayfair's policy against work avoidance during her time with the company. ECF No. 25-3 at 63:19-64:25.

Second, Daimaru objects to the content of several employment records that Wayfair references, including her attendance report, development plan, final written warning, and

termination report. Specifically, Daimaru objects to these records as lacking foundation and constituting hearsay to the extent that Wayfair attempts to rely on the reports to prove their contents (i.e., using the attendance report to prove that Daimaru was absent or late, or using the final written warning to prove the content of the work avoidance numbers set forth in the warning).

But Rule 803(6) of the Federal Rules of Evidence provides an exception to the hearsay rule for business records that are "kept in the course of regularly conducted business activity . . . if it was the regular practice of that business to make the . . . record." And a plaintiff's "performance evaluations, corrective action plans, and disciplinary documents are all business records." *Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 956 (7th Cir. 2021); *see also Johnson v. Salt Lake City Sch. Dist.*, No. XX, 2021 WL 4895241, at *5 (D. Utah Oct. 20, 2021) ("Written reprimand and the non-renewal letter can also constitute business records."); *Parrish v. Roosevelt Cnty. Bd. of Cnty. Comm'rs*, No. CIV 15-0703 JB/GJF, 2017 WL 6759103, at *17 (D.N.M. Dec. 31, 2017) (admitting information from a personnel file under Rule 803(6) because "the personnel file is a business record"); *In re Air Crash Disaster at Stapleton Int'l Airport*, 720 F. Supp. 1493, 1499-1500 (D. Colo. 1989) (admitting into evidence personnel files under the business record exception). Accordingly, the court overrules Daimaru's objections.

### B.    *Defendants' Objection*

Wayfair contends that Daimaru's declaration is a sham affidavit that conflicts with her prior sworn statements. It argues that this deficient evidence was submitted to create the appearance of a genuine dispute of material fact where none exists. ECF No. 43 at 5-6. Although "[a]n affidavit may not be disregarded solely because it conflicts with the affiant's prior sworn statements," the court must nonetheless disregard a conflicting affidavit if it "constitutes an attempt to create a sham fact issue." *Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th

Cir. 2009) (citation and alterations omitted). In determining whether a conflicting affidavit or declaration creates a sham fact issue, the Tenth Circuit instructs the court to consider whether:

> (1) the affiant was cross examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.

*Law Co.*, 577 F.3d at 1169 (citation omitted).

But as a foundational matter, Plaintiff's affidavit and her prior sworn statements do not conflict. Daimaru's affidavit simply lends additional detail to the pre-existing record by explaining her belief that she "made sure to log [her] hours for breaks due to [her] condition for which [she] was approved for FMLA," and her claim that Wayfair's attendance reports falsely "suggest[ed] that [she] never requested, asked for or logged FMLA leave requests after February 20, 2019." ECF No. 37-3 at 3-4. These statements, along with other similar statements in Daimaru's affidavit, are in line with her earlier deposition contentions. Namely, that when she took FMLA leave she tracked her time off using notes on her computer and subsequently submitted this recorded information "through [Wayfair's] internal system." ECF 25-3 at 83:22-84:22. Throughout her deposition, Daimaru also consistently insinuated that she believed Wayfair's attendance statistics did not accurately reflect her FMLA requests and time punches. When asked if she believed that Wayfair's records were "made up," Daimaru replied that she did not "believe they were made up," but she did think her absences were "in correlation to [her] using FMLA" that mistakenly did not appear in any Wayfair time log. *Id.* at 83:7-12. While Daimaru's affidavit certainly strengthens her claim against Wayfair, which seems to be Defendants' main concern, it is nonetheless consistent with her prior deposition. As such, the court will not disregard the content of the affidavit and has no reason to engage in further analysis of whether Daimaru attempted to create a "sham fact issue." *See Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n. 3 (10th Cir. 2014) (explaining

8

that the affidavit at issue in the case was not a sham because it did "not appear to contain any allegations that would directly contradict . . . earlier deposition testimony regarding the question presented.").

## II.   FMLA INTERFERENCE

An FMLA "interference claim arises when an adverse employment decision is made before the employee has been allowed to take FMLA leave or while the employee is still on FMLA leave." *Dalpiaz v. Carbon Cnty.*, 760 F.3d 1126, 1132 (10th Cir. 2014). "To establish a claim of FMLA interference under § 2615(a)(1), an employee must show '(1) that she was entitled to FMLA leave, (2) that some adverse action by the employer interfered with her right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of her FMLA rights.'" *Id*. (quoting *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007)). "If the employee can demonstrate that the first two elements of interference are satisfied, the employer then bears the burden of demonstrating that the adverse decision was not 'related to the exercise or attempted exercise of [the employee's] FMLA rights.'" *Id.* (citation omitted). In other words, "[a]n employer can defeat an FMLA interference claim 'by showing that the employee would have been terminated anyway, i.e., regardless of the request for FMLA leave.'" *Carter v. Spirit Aerosystemcs, Inc.*, 827 F. App'x 864, 869 (10th Cir. 2020) (unpublished) (citation omitted).

The first element of Daimaru's FMLA interference claim, that she was entitled to FMLA leave, is undisputed by the parties.

To satisfy the second element, that some adverse action by Wayfair interfered with Daimaru's right to take FMLA leave, "the employee must show that she was prevented from taking the full 12 weeks' of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave." *Campbell*, 478 F.3d at 1287. Wayfair argues that because

it granted all of Daimaru's recorded FMLA leave requests, Daimaru cannot meet the burden of proving this element. Defendant is incorrect. Daimaru alleges that the primary act that interfered with her use of FMLA was not denial of her leave requests, but rather her termination. ECF No. 25-3 at 81:13-14. In the case of termination, "an employee may be dismissed, preventing her from exercising her statutory right to FMLA leave—but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002). In other words, if Daimaru can produce evidence that her termination occurred because of her use of FMLA leave, then she can meet the requirements of the second element. The court analyzes the third interference claim element to determine whether such evidence exists.

To demonstrate the third element, a plaintiff must show that "the employer's action was related to the exercise or attempted exercise of her FMLA rights." *Dalpiaz*, 760 F.3d at 1132. However, "the employer is not required to show that the adverse employment decision and the employee's FMLA request are completely and entirely unrelated." *Id.* "While 'related' may be defined in a broad sense as simply 'connected' or 'associated' in some way, [Tenth Circuit] cases have clarified that an 'indirect causal link between dismissal and an FMLA leave is an inadequate basis for recovery.'" *Id.* (citations omitted). For instance, "if an employer presents evidence that an employee was dismissed for her failure to comply with the employer's absence-notification policy, this is sufficient to demonstrate the termination was not legally 'related to' the exercise of FMLA leave, even if the employee's absences were caused by a requested medical leave." *Id.* at 1332-33 (citation omitted). Indeed, an employee's "request for an FMLA leave does not shelter her from the obligation, which is the same of that of any other . . . employee, to comply with [the

employer's] employment policies, including its absence policy." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877-78 (10th Cir. 2004).

Wayfair claims that this fact pattern is repeated here. The company's absence-notification policy provides that "[f]or unforeseeable leaves . . . an employee must provide notice as soon as practicable" and that "[f]ailure to provide such notice . . . may result in other adverse consequences." ECF No. 25-5 at 3. Wayfair adduces evidence that Daimaru did not comply with these requirements, either before or after her Final Written Warning. *See* ECF No. 25-8 at 9 ("[Daimaru] didn't report to our talent management team that she was using FMLA, and she – nor did she clock out or get it corrected."); *Id.* at 10 ("[Daimaru] was very bad about entering her FMLA on time."); ECF No. 49-1 at 108:11-14 ("She didn't tell me she was taking a break, she didn't tell HR she was using FMLA, she didn't tell WFM that she should have been clocked out during a certain period of time."). O'Day testified that "while its possible that [Daimaru's] missed time in reality was related to whatever her health issue was, she did not follow the process of informing our HR department that she was using FMLA time, nor did she reach out to our workforce management to make sure she got clocked out during the time she was gone." ECF No. 49-1 at 78:18-24. Indeed, the logs that kept track of Daimaru's time punches and FMLA leave requests did not account for her substantial breaks, even after her Final Written Warning. ECF No. 37-4.

Daimaru responds to Wayfair's evidence, attempting to create a dispute of material fact. Contradicting Wayfair, Daimaru asserts that in the period following her Final Written Warning she "made sure to log [her] hours for breaks due to [her] condition for which [she] was approved for FMLA." ECF No. 37-3 at 4. She claims that she kept "thorough notes of [her] inactive periods of time wherein [she] was unable to take a phone call, and also communicat[ed] the information to

Mr. O'Day." *Id*. Daimaru also contends that she "used Wayfair's internal timekeeping systems . . . each period of time [she] used FMLA." *Id*. And finally, she argues that the periods of time for which she supposedly asked for FMLA leave and the periods of time during which she was accused of work avoidance were correlated. ECF No. 25-3 at 86:13. Though Wayfair has produced records showing that Daimaru failed to punch out for a break more than a handful of times between February 20, 2019, and April 1, 2019, Daimaru argues that these records are "false and not complete." ECF No. 37-3 at 3. Daimaru has little corroborating evidence to back up this claim,[2] indeed she admits that she does not "have any physical evidence on [her] side," ECF No. 25-3 at 83:18-19, but it is not the court's place to weigh the strength of each parties' evidence when evaluating a motion for summary judgement. *Anderson*, 477 U.S. at 249. Assuming Daimaru is correct about these facts, after her Final Written Warning on March 12, 2019, she would have mostly been in compliance with Wayfair's employment policies and with O'Day's expectations. ECF No. 25-18 at 4.

But, even assuming that Daimaru properly recorded and reported her FMLA leave throughout February and March, Wayfair still prevails. Wayfair has established that it justly terminated Daimaru for her failure to alert it to the fact that her time punches were not appearing in its attendance logs before the end of each pay period, as required by the company's absence notification policy. ECF No. 25-18 at 4. Prior to issuing biweekly paychecks, Wayfair policy requires employees to review their time punches for accuracy. *Id*. O'Day constantly reminded his team that "[i]t is the employee's responsibility to review his or her time record to certify the

---

[2] Daimaru does seem to argue that Wayfair incorrectly marked a number of absences as "unpaid time off" instead of "FMLA leave." ECF No. 35 at 23 (citing to unpaid time off on February 21, 25-28, March 4-5, 7, 11, 13-14, 18-21, and 25-26). But this claim is a red herring. Wayfair was never concerned about Daimaru taking unpaid time off. Rather, it acted because of time that it paid Daimaru for while she was not working. In fact, these periods of unpaid leave were possibly moments when Daimaru clocked out to take FMLA leave that she would have been paid for once her FMLA time was retroactively approved.

accuracy of all time recorded, prior to the end of the pay period." *Id.* at 3. And he specifically alerted Daimaru of this expectation in her Final Written Warning. *Id.* at 4. Wayfair contends that, given this policy, Daimaru had an obligation to check her time punches for mistakes to ensure she was not being overpaid during each pay period. Daimaru should have checked her time log at some point between her Final Written Warning on March 12, 2019, and O'Day's spot check of her time punches on March 31, 2019—reporting any inaccuracies as they arose. While Daimaru claims that she performed such a spot check, her logs were inaccurate according to Wayfair. Daimaru did occasionally clock out for unpaid leave during February and March, but Wayfair still identified 423 minutes of work avoidant behavior beyond these unpaid periods. ECF No. 35 at 32; ECF No. 25-18 at 1.

Daimaru's failure to make sure her time punches were properly loaded into the system for pay purposes means that she was paid for hours she did not work. The result of this error is that Daimaru ultimately violated Wayfair's absence notification policy and that the company had legitimate grounds for termination. Therefore, Daimaru cannot show that Wayfair's decision to terminate Daimaru "was related to the exercise or attempted exercise of her FMLA rights," *Dalpaiz*, 760 F.3d at 1132, and Wayfair is entitled to summary judgment on Daimaru's interference claim.

## III.    FMLA RETALIATION

The Tenth Circuit has interpreted the FMLA to allow for claims under a retaliation theory. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006). To analyze these claims, it employs the *McDonnell Douglas* burden shifting framework. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under *McDonnell Douglas*, sequentially (1) a plaintiff must establish a prima

facie case of retaliation, (2) the defendant must offer a legitimate non-retaliatory or discriminatory reason for the adverse employment action in question, and (3) the plaintiff must show that there is at least a genuine issue of material fact as to whether the defendant's proffered reason is pretextual. *Id*.

### A.     Prima Facie Case

To successfully establish a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) she engaged in a protected activity, (2) she was subject to adverse employment action, and (3) a causal connection exists between the protected activity and the adverse action. *Dewitt*, 845 F.3d at 1318-19 (citation omitted). "The standard for proving a prima facie case . . . is low." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002). Indeed, a plaintiff need not overcome defendant's proffered reason for termination. Rather, "[t]he 'critical inquiry' at this prima facie stage is 'whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination.'" *Metzler*, 464 F.3d at 1171 (quoting *Garrett*, 305 F.3d at 1221.).

Here, the parties do not dispute the first two elements. Daimaru engaged in a protected activity by requesting and taking FMLA leave for her health condition, and she suffered an adverse action when Wayfair terminated her. But the parties do disagree about whether a causal connection exists between the first two elements.

In this case, the most straightforward way to establish a causal connection is to rely on temporal proximity between the protected activity and the termination. Indeed, the Tenth Circuit has "repeatedly recognized temporal proximity between protected conduct and termination as relevant evidence of a causal connection sufficient to justify an inference of retaliatory motive." *Metzler*, 464 F.3d at 1171 (quotation omitted); *see also Anderson v. Coors Brewing Co.*, 181 F.3d

14

1171, 1179 (10th Cir. 1999). But "a plaintiff may rely on temporal proximity alone only if 'the termination is *very closely* connected in time to the protected activity.'"

Here, Daimaru renewed her FMLA leave on March 26, 2019, and Wayfair terminated her on April 1, 2019—less than a week later. Such close proximity in time is strong evidence of causation. Indeed, the Tenth Circuit has found that significantly longer periods of time can suffice to establish causation. *See, e.g.*, *Metzler*, 464 F.3d at 1171-72 (four to six weeks is sufficient); *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (holding that a one-and-a-half-month period between the protected activity and the adverse action may, by itself, establish causation).

In reply, Wayfair urges the court to look to the totality of the evidence. Specifically, Wayfair highlights that it issued Daimaru a Final Written Warning prior to her request to extend her FMLA leave. Wayfair is correct that O'Day issued the Final Written Warning on March 12, 2019, prior to Daimaru's request for an extension on March 25, 201, but the record also indicates that Daimaru was in contact with Wayfair's Human Resources department with regard to extending her FMLA leave prior to O'Day's Final Written Warning. ECF No. 25-18. On March 5, 2019, Daimaru emailed Human Resources indicating that she intended to renew her FMLA. ECF No. 37-5. In fact, O'Day's Final Written Warning only followed Daimaru's email by seven days. Accordingly, the totality of the evidence indicates that Daimaru put Wayfair on notice that she intended to exercise her FMLA rights *just before* Wayfair issued the Final Written Warning that set in motion the events leading to Daimaru's termination. Therefore, the court finds that Daimaru has established a prima facie case of FMLA retaliation.

### B.    Legitimate Non-Discriminatory Reason

Wayfair cites Daimaru's history of numerous instances of work avoidance and her failure to comply with its absence notification policies as its legitimate non-discriminatory reason for her termination. Daimaru does not dispute that Wayfair claimed a legitimate, non-discriminatory reason. The court concurs that this reason satisfies Wayfair's burden under *McDonnell Douglas*.

### C.    Pretext

A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that a defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief, (2) evidence that a defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances, or (3) evidence that a defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision that affected the plaintiff. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). Moreover, a plaintiff can also demonstrate pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997).

Daimaru sets forth five arguments that she contends support a finding of pretext: (1) temporal proximity, (2) Wayfair's animus towards FMLA leave, (3) Wayfair's failure to conduct an investigation, (4) the falsity of Wayfair's reasons for termination, and (5) Wayfair's failure to grant Daimaru an opportunity to update her FMLA request after renewal. The court considers and rejects each argument in turn.

### i.      Temporal Proximity

As the court noted above, Daimaru easily establishes temporal proximity between her request to extend her FMLA leave and her termination. But while close temporal proximity can establish a prima facie case of discrimination, it cannot, alone, establish pretext. *Metzler*, 464 F.3d at 1172 ("[T]his court has refused to allow even very close proximity to operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext."); *see also Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007) ("Although we may consider evidence of temporal proximity—typically used to establish a prima facie case—in analyzing pretext, temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext."). Accordingly, the court considers the remaining arguments offered by Daimaru.

### ii.      Animus Towards FMLA Leave

Daimaru points to three pieces of evidence that allegedly demonstrate Wayfair's retaliatory animus towards her exercise of her FMLA rights. First, Daimaru argues that O'Day's decision to audit Daimaru's attendance record and FMLA usage during the final two weeks of her first six months of FMLA leave demonstrates animus. The court disagrees. O'Day's duties as a manager included monitoring attendance—including use of FMLA—by members of his team. ECF No. 49-1 at 14:19-21. Indeed, the record demonstrates that O'Day regularly engaged in conversations with Daimaru and his whole team about attendance issues. ECF No. 25-18 at 3. Accordingly, O'Day's audit is not evidence of animus. Rather, it simply demonstrates that he was doing his job.

Second, Daimaru argues that Wayfair provided false information regarding the leave and recertification process and that this falsity is evidence of animus. Although she does not go into detail, it appears that Daimaru refers to the fact that Human Resources informed her that she could obtain backdated paperwork from her doctor that would mean HR would approve her FMLA time

from February 15, 2019, to March 25, 2019. ECF No. 49-1 106:3-4. Whether this claim was false is disputed. Wayfair argues that Daimaru was given every opportunity to make requests for backdated FMLA leave and that she failed to submit proper notifications for periods of time when she allegedly avoided work. ECF No. 43 at 8. As evidence, Wayfair adduces logs showing that it granted Daimaru backdated FMLA leave on February 18, 19, and 20, 2019—after the expiration of her first six months of leave on February 15, 2019. ECF No. 37-4 at 1. Daimaru, on the other hand, contends that she requested substantially more FMLA time for backdating in February and March than appears in Wayfair's logs, and that these requests were either ignored or denied. ECF No. 37-3 at 5. But even if it is true that Wayfair provided false information regarding the backdating of FMLA leave, this alone is not sufficient evidence of Wayfair's animus. Daimaru does not attempt to show that this falsity was based on any impermissible motive or displeasure with her decision to take FMLA leave. More evidence is needed to make the case that Wayfair's actions were motivated by animosity.[3]

Third, Daimaru argues that O'Day's testimony that Daimaru's breaks were "typical work avoidance behaviors" and that she was simply using FMLA to "shield herself" from termination is evidence of his animus towards FMLA leave. ECF No. 49-1 at 110:9-10, 110:19-20. O'Day made these comments at his deposition, long after the events in this case transpired. His remark that Daimaru's breaks were "typical work avoidance behaviors" simply attempted to explain to Daimaru's counsel why he believed that Daimaru's breaks were not due to FMLA leave. Specifically, O'Day drew a comparison between Daimaru's use of her breaks and behavior by members of his team without FMLA leave who were also fired for work avoidance. And O'Day's

---

[3] Even though falsity alone is not necessarily evidence of animus, this does not mean that falsity cannot help Daimaru show pretext, as detailed below.

references to "shield herself" reads in full: "So while Christine might claim to use FMLA as kind of a way to maybe shield herself, these are regular behaviors that you see with people who work avoid." *Id*. at 110:19-20 O'Day's comments merely reflect his perception—based on his experience as a manager—that Daimaru's breaks were not due to FMLA needs. They do not demonstrate that he had any animus towards legitimate usage of FMLA leave.

Indeed, there is substantial evidence that O'Day went out of his way to accommodate Daimaru's FMLA usage. He would assign fewer tickets to Daimaru because "Christine used her FMLA frequently and [he] did not think it was fair for her to have the same amount of work as her peers." *Id*. at 21:23-25. In fact, O'Day initially suggested to Daimaru that she go on FMLA after he noticed that she regularly needed extra bathroom breaks. *Id*. at 70:7-9 ("[I]t was at my direction that she went and pursued an FMLA accommodation."). And O'Day frequently made sure that Daimaru entered her FMLA when Daimaru forgot to do so. *Id*. at 92:10-14 ("Christine was notoriously bad about entering her FMLA, and so I was always reminding her, 'Hey you left early yesterday. Make sure you get your FMLA in today.'"). Moreover, despite Wayfair's strict work avoidance policy, O'Day claimed that he had a personal policy of giving his employees the benefit of the doubt. *Id*. at 81:21-24. Accordingly, when he discovered a potential work avoidance issue, he typically "reach[ed] out and talk[ed] to [the employee] about it and g[a]ve them the opportunity to explain themselves." *Id.* O'Day gave Daimaru just such an opportunity when he first noticed discrepancies in her timekeeping. *Id*. at 81:25-82:6. In sum, the court finds that Daimaru's allegations of animus simply do not comport with the evidence.

### iii.     Failure to Conduct an Investigation

Daimaru argues that Wayfair's failure to investigate the work avoidance issues identified by O'Day provides further evidence of pretext. The Tenth Circuit has held that "[a] failure to

conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext." *Smothers*, 740 F.3d at 542 (internal quotation marks omitted). The "focus here is not on whether [an] investigation was optimal (i.e., text-book best practices)." *Dewitt v. S.W. Bell Tel. Co.*, 845 F.3d 1299, 1315 (10th Cir. 2017). One indication of unfairness in an investigation is when an "employer relie[s] on one-sided information about a [dispute] . . . and deliberately prevent[s] the plaintiff from responding to the allegations against him." *Gupta v. Okla. City Pub. Schs.*, No. 21-6138, 2022 WL 1742048, at *6 (10th Cir. May 31, 2022) (citing *Smothers*, 740 F.3d at 542-43). However, "an employer may ordinarily 'defeat the inference' of pretext stemming from an allegedly unfair investigation by simply asking an employee for his version of events." *Dewitt v. S.W. Bell Tel. Co.*, 845 F.3d 1299, 1314 (10th Cir. 2017) (citation omitted).

Here, there is not sufficient evidence to show that Wayfair's investigation of Daimaru's alleged work avoidant behavior was unfair. Daimaru first argues that O'Day failed to look beyond Wayfair's attendance and leave logs during his termination investigation when he should have known to make further enquiries. In her affidavit, Daimaru states that after her Final Written Warning she "made notes and logged [her] hours and made sure to submit all of [her] recorded time by submitting a ticket to the Human Resources Department, and to notify Mr. O'Day." ECF No. 37-3 at 5. On these facts, O'Day was in constant communication with Daimaru about her leave. Daimaru claims that he should have known that any work avoidant behavior he spotted in her logs was a mistake in Wayfair's "false" records and contacted her to correct the error. ECF No. 37-3 at 3. Yet, "Mr. O'Day did not request any information about whether [she] had submitted, needed to report, or otherwise take any actions related to reporting [her] retroactive FMLA leave and the times [she] logged during the lapse in [her] FMLA." ECF No. 37-3 at 6.

O'Day did not act improperly when he solely relied on Wayfair's attendance and absence logs. Wayfair notes that the time-stamped data that O'Day referenced in his investigation included all of Daimaru's time punches and leave requests—both accepted and rejected. ECF No. 43 at 12. Daimaru may respond that O'Day still should have recognized that there could be missing data in the logs, but ultimately this assertion is not enough to overcome summary judgment. Even if her logs were in error, Daimaru had a responsibility to fix any issues with her attendance and leave data before the end of each biweekly pay period. ECF No 25-18 at 4. O'Day may have known that the logs contained mistakes, but he was justified in ending the investigation because Daimaru's failure to update her records breached Wayfair's employment policy.

Daimaru still might argue that Wayfair tainted the fairness of her investigation by "deliberately preventing" her from sharing her version of the events leading up to her termination. *Gupta*, No. 21-6138 at *6. She alleges that Wayfair failed to "request any information about whether [she] had submitted, needed to report, or otherwise take any actions related to reporting [her] retroactive FMLA leave and the times [she] logged during the lapse in [her] FMLA," ECF No. 37-3 at 6, and Wayfair admits as much. O'Day conceded that during his call terminating Daimaru neither he, nor anyone else from Wayfair, ever broached the topic of whether FMLA leave might have explained her absences from work. ECF No. 49-1 at 117:12-23. Yet, Daimaru cannot prevail on her claim that Wayfair blocked her from sharing her side of the story. Wayfair's failure to ask for more information is not the same as a deliberate attempt to prevent her from arguing her case. Moreover, in her deposition, Daimaru notes that during her termination call, a Wayfair employee, Al Edwards, ended up "battling [her] in regards [sic] to what [her] FMLA was approved for." ECF No. 35 at 36. Daimaru asked Edwards (as well as O'Day) "if the instances where he saw [she] wasn't – [she] didn't have any record of working, if they were in correlation to FMLA

requests [she] had sent and used." ECF No. 35 at 36. It is unclear how Edwards responded to this question from the deposition testimony on the record, but at the very least, this exchange indicates that Daimaru had some opportunity to share her experiences.[4] The evidence presented is, thus, not enough to create a genuine dispute as to whether Wayfair conducted a fair investigation.

### iv.      The Falsity of Reasons for Termination

Daimaru argues that Wayfair's reasons for termination are incapable of belief and, consequentially, pretextual. The standard for proving pretext through falsity is not whether there is evidence that claims made by an employer are false, rather, "a challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff." *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000).

Here, Plaintiff has produced evidence that Wayfair falsely asserted that she failed to take FMLA leave even when it knew or should have known that Daimaru requested leave. According to Daimaru, Wayfair was on notice that she was submitting a substantial number of requests for FMLA leave during the period between February 15, 2019, and her termination on April 1, 2019. As previously noted, Daimaru contends that she was in direct communication with O'Day whenever she needed to take FMLA leave after her Final Written Warning. ECF No. 37-3 at 5. If these facts are true, O'Day would have known that Daimaru was submitting requests for FMLA leave even though they were not appearing in Wayfair's leave system. Thus, when O'Day claimed that she was avoiding work while failing to ask for FMLA leave, he falsely disregarded his own knowledge of the reasons for Daimaru's absences in order to justify her termination.

---

[4] It is worth noting that in his deposition O'Day explicitly does not recall this discussion. ECF No. 49-1 at 117:12-23. But O'Day also claims that Daimaru was given a chance to explain her version of events. *Id.* at 118:4-6 ("Q. Did Christine ever say why she took frequent breaks? A. She denied that they happened.")

Wayfair responds to Daimaru's argument by noting that she had a long history of work avoidance, spanning months before February 2019—even properly taking FMLA leave into account. *See* ECF Nos. 25-15, 25-16, 25-17, 25-18, 25-8 at 5. These undisputed absences created a legitimate concern about Daimaru's ongoing behavior and reasonably colored Wayfair and O'Day's perception of Daimaru's conduct. When O'Day examined Daimaru's attendance logs and saw work avoidant behavior with no corresponding FMLA leave or time punches, he likely did not give her the benefit of the doubt. But from Wayfair's perspective, Daimaru did not deserve the benefit of the doubt given her past employment history. This investigation was the last straw after she had already been given many chances to properly record her leave. It should come as no surprise that Wayfair chose not to engage in an elaborate investigation into Daimaru's conduct.

Yet, regardless of whether Wayfair should have known that Daimaru requested unrecorded FMLA leave to cover her absences and conducted further investigation into her missing hours, Wayfair still prevails. It is undisputed that Daimaru had an obligation to ensure that her attendance and leave logs were accurate before the end of each pay period. ECF No. 25-18 at 4. As previously detailed, Daimaru failed to adequately certify her time in violation of Wayfair's policies. Wayfair cannot be faulted for relying on the attendance logs which were used to pay Daimaru. If these logs were accurate, then Wayfair was right to find that Daimaru had avoided work. If they were inaccurate, it would simply mean that Daimaru was paid for more work than she performed and had not alerted Wayfair. In either world, from Wayfair's perspective, her termination was justified, rather than based on falsity. Thus, the court finds that there is no genuine dispute of material fact in regard to this issue.

###### v.        Opportunity to Update FMLA Requests

Daimaru finally claims that Wayfair failed to provide her with an opportunity to update her FMLA requests following her FMLA recertification. This argument fails because even if Daimaru was still waiting for the opportunity to backdate her FMLA time (following renewal of her FMLA status), she needed to report the time she wished to take for FMLA leave as unpaid time off before the close of each pay period. *Id*. Daimaru was required to report this time as unpaid leave because if she did not report it, she would have been paid for time that she did not spend working. In other words, if Daimaru had been reporting her time properly, she would have logged a number of unpaid absences that correlated one-to-one with the time O'Day claimed she was work avoiding. Daimaru understood that to take FMLA leave she needed to clock out and take unpaid time off. ECF No. 25-3 at 68:25-69:7 ("Q. You also knew that you needed to clock out for any breaks longer than 20 minutes, right? A. Yes. Q. And then if you missed any time punches you needed to enter a WFM ticket, correct? . . .  A. Yes."). Indeed, she properly logged several periods of unpaid leaves in February and March. Daimaru may have taken this time off with the intent to eventually backdate these periods as FMLA leave.

But when O'Day investigated Daimaru's work avoidance on March 31, 2019, he did not see unpaid absences when Daimaru was not ready to take calls. Rather, O'Day recorded multiple instances where Daimaru took breaks without clocking out and improperly used "not ready" time. In all instances, Daimaru would have been paid for the time in which she reported that she was working even though O'Day discovered that she was not actually working. To put it differently, Daimaru was not terminated for taking too much unpaid time off (i.e., time that could later have been backdated as FMLA leave) but rather for representing that she was working while not engaging in work tasks. Wayfair's policy clearly prohibits such behavior. Even if Daimaru claims

that she attempted to take additional unpaid days of leave that did not appear in Wayfair's leave log, her argument still fails. Once more, Daimaru did not meet her obligation to ensure that her logs were accurate before the end of each pay period. ECF No. 25-18 at 4.

Because Daimaru fails to provide sufficient evidence to show that there is a dispute as to whether Wayfair's termination decision was based on pretext, her retaliation claim fails.

## CONCLUSION

The court GRANTS Wayfair's motion for summary judgment.


DATED September 26, 2022.

BY THE COURT                    .

Jill N. Parrish
United States District Court Judge